UNITED STATES, Appellee,

v.

David D. PARKER, Private, U.S. Marine Corps, Appellant.

No. 41,467.
NMCM No. 80–0637.

U.S. Court of Military Appeals.

March 14, 1983.

For Appellant: *Lieutenant Daniel Lippman, JAGC, USNR* (argued); *Lieutenant Lynn M. Maynard, JAGC, USN* (on brief); *Major James P. Axelrod, USMC.*

For Appellee: *Lieutenant Commander Craig A. Biegel, JAGC, USNR* (argued); *Captain T.C. Watson, Jr., JAGC, USN, Lieutenant Wm. Eric Minamyer, JAGC,*

USNR (on brief); *Commander W.J. Hughes, JAGC, USN.*

## Opinion of the Court

COOK, Judge:

The accused shot his roommate, Lance Corporal Drury, with a .45-caliber, government-issue pistol. The bullet entered the victim's back and transversed through his body, striking the liver and certain veins. Although the victim retained consciousness for a time, he subsequently died at a Naval hospital. The facts surrounding the shooting are not in dispute, and were virtually conceded by the defense at trial.[1] For this act, the accused was convicted, despite his pleas, by a general court-martial, of premeditated murder and assault, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 928, respectively. The adjudged and approved sentence extended to a dishonorable discharge, confinement at hard labor for life, and total forfeitures. The United States Navy-Marine Corps Court of Military Review affirmed the findings and sentence. 11 M.J. 757 (1981). We granted the accused's petition on the following issue:

WHETHER THE MILITARY JUDGE'S RULING PERMITTING THE PROSE-

---

1. The defense brief offers the following Statement of Facts:

 The facts of the alleged offense were not controverted at trial, the sole issue being the state of appellant's mind at the time of the incident, and the degree of his legal responsibility for what occurred. The testimony of Lance Corporal Clough (R. 287–288), Lance Corporal Christie (R. 289–290), Lance Corporal Lett (R. 291–294), Private First Class Maldenado (R. 295–303), Private First Class Gomez (R. 303–306), Corporal Myers (R. 307–310), and Corporal Knapp (R. 311–317), is generally to the effect that on the morning of the fateful shooting, the appellant's two roommates, Private First Class Drury and Private First Class Maldenado were preparing their room for an IG inspection to occur later that same day. Appellant had guard duty that morning and was preparing to assume the watch. At breakfast, Drury, the deceased, had "ordered" the appellant to return to his room for the purpose of cleaning his portion of the quarters, which had already then occasioned some open animosity (R. 290), and when appellant nonetheless assumed his watch at 0635 (R. 292), Private First Class Drury succeeded, through the good offices of the Sergeant of the Guard, to have the Corporal of the Guard, Corporal Lett, order the appellant off his watch to return to his room to help clean it, at about 0820 (R. 299), to which appellant repaired forthwith, "swearing and cussing under his breath" at the intervention. When appellant rejoined his roommates, who had been his roommates for only "two or three weeks" before the incident, "he didn't say nothing" but started "doing his rack" and "putting his clothes inside his wall locker" (R. 299), until he was summoned by Private First Class Gomez, acting on the Sergeant of the Guard's (Davis) instructions, to return to his watch. The deceased again intervened, arguing that appellant wasn't finished, but Sergeant Davis insisted, again sending Gomez to fetch Parker, this time successfully, for Parker followed Gomez back to the quarterdeck (R. 304), at which point in time the deceased hurled the imprecation "come back, mother fucker, come back" after the departing Parker[1] (R. 304). The Corporal of the Guard (Lett) testified that at "somewhere around 0830" (R. 293), Parker returned to the quarterdeck and was reissued his .45 caliber gun and ammunition (R. 294); thus equipped, he returned to his quarters, where, according to the excited utterances of Drury, who subsequently died of the effects, appellant shot his roommate. Leaving his room, the appellant encountered Lance Corporal Ronnie Hayes, on the third floor landing of the staircase, busily sweeping the same for the inspection, and, apparently because Hayes was physically blocking the doorway to that staircase, the appellant gestured with the .45 caliber pistol in such a manner as to cause Lance Corporal Hayes to believe the weapon was pointed at him, Hayes, which impression resulted in Hayes discontinuing the inquiries he had directed towards Parker and [caused him] to retire from appellant's line of progress (R. 320–321). That incident gave rise to the second charge. Leaving the building the appellant proceeded to walk towards the mess hall "down the sidewalk," where he was observed by Gunnery Sergeant Mills, who called out Parker's name; this resulted in appellant turning about and walking up to the gunnery sergeant, who retrieved the pistol Parker was carrying from the holster, wherein it rested, albeit with the flap unbuttoned (R. 323). Appellant was then placed in custody; the charges against appellant resulted as a consequence of the foregoing incidents.

 [1] Which shouts occasioned the appellant to mutter "I'm going to get him," but not in a fashion, according to the witness Gomez, which suggested that appellant was contemplating homicide (R. 305).

CUTION TO ELICIT FROM THE GOVERNMENT PSYCHIATRISTS THEIR RELATION OF APPELLANT'S NARRATIVE OF THE SUBSTANTIVE EVENTS GIVING RISE TO THE CHARGES AGAINST HIM, OBTAINED DURING THE COURSE OF THEIR *BABBIDGE*-COMPELLED 121 BOARD INTERVIEW, ERRONEOUSLY AND PREJUDICIALLY BURDENED APPELLANT'S SIMULTANEOUS RIGHT TO PRESENT AN INSANITY DEFENSE AND CONCURRENTLY REFRAIN FROM INCRIMINATING HIMSELF AT TRIAL?

We hold that it did not and affirm.

 Since the decision in *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40

L.Ed. 499 (1895), it has been the rule in the overwhelming majority of American courts that the burden of proving the sanity of a particular defendant beyond a reasonable doubt is upon the prosecution, just as is every other element of the offense charged.[2] Military justice is no exception. *See* para. 122a, Manual for Courts-Martial, United States, 1969 (Revised edition). However, in giving the prosecution the burden of proving the mental capacity of the accused to commit the crime, the courts have recognized that the prosecution must be afforded some opportunity to acquire evidence for this purpose.[3] Since the accused is often the sole source of such evidence, various procedures have been developed to permit the prosecution to obtain from him the basis for expert medical testimony.[4] To the extent that the accused is

2. At the time, there were two lines of authorities on the issue of the burden of proof of sanity. *See* cases cited in the brief of the Assistant Attorney General in the case of *Davis v. United States,* 160 U.S. 469, 471, 16 S.Ct. 353, 40 L.Ed. 499 (1895). The Supreme Court held:

> We are unable to assent to the doctrine that in a prosecution for murder, the defense being insanity, and the fact of the killing with a deadly weapon being clearly established, it is the duty of the jury to convict where the evidence is equally balanced on the issue as to the sanity of the accused at the time of the killing. On the contrary, he is entitled to an acquittal of the specific crime charged if upon all the evidence there is reasonable doubt whether he was capable in law of committing crime.

*Id.* at 484, 16 S.Ct. at 357.

> Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defence is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question from the time a plea of not guilty is entered until the return of the verdict, is whether upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged. His guilt cannot be said to

have been proved beyond a reasonable doubt—his will and his acts cannot be held to have joined in perpetrating the murder charged—if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he wilfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased. As the crime of murder involves sufficient capacity to distinguish between right and wrong, the legal interpretation of every verdict of guilty as charged is that the jury believed from all the evidence beyond a reasonable doubt that the accused was guilty, and was therefore responsible, criminally, for his acts. How then upon principle or consistently with humanity can a verdict of guilty be properly returned, if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity in law of the accused to commit that crime?

*Id.* at 487–88, 16 S.Ct. at 358.

3. *See United States v. Albright,* 388 F.2d 719 (4th Cir.1968); *Rhodes v. United States,* 282 F.2d 59 (4th Cir.), *cert. denied,* 364 U.S. 912, 81 S.Ct. 275, 5 L.Ed.2d 226 (1960); *State ex rel. La Follette v. Raskin,* 34 Wis.2d 607, 150 N.W.2d 318 (Wis.1967); *State v. Whitlow,* 45 N.J. 3, 210 A.2d 763 (N.J.1965).

4. *United States v. Albright, supra* 388 F.2d at 721 n. 3; *State v. Whitlow, supra* 210 A.2d at 773 n. 3; *see also* Annot., 23 A.L.R.Fed. 710. In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court seems to approve the mandatory examination by prosecution psychiatrists where the defendant has pleaded not guilty by reason of insani-

compelled to submit to examination by prosecution experts, he may be forced to disclose evidence that may incriminate him of the offense charged. Thus, there is an inherent "tension" between the accused's right against self-incrimination and the prosecution' s ability to have fair "access to the only reliable means of ascertaining the truth concerning a defendant's sanity." *United States v. Albright,* 388 F.2d 719, 724 (4th Cir.1968). The balancing of these two interests has been perplexing:

> It would be most anomalous to say that a defendant may advance the defense of insanity, have himself examined by his own experts and then invoke the constitutional guarantees against self-incrimination for the purpose of preventing examination by the State.... To allow the accused to obtain his own expert, and after a private and unlimited conference with him and examination by him, to plead insanity, and then put forward the privilege against self-incrimination to frustrate like activities by the prosecution is to balance the competing interests unfairly and disproportionately against the public.

*State v. Whitlow,* 45 N.J. 3, 210 A.2d 763, 767 (N.J.1965).

In balancing these competing interests, more than half of the states, the District of Columbia, and the Federal system permit or require examination of an accused when the defense of lack of capacity or sanity is raised. *Id.* n. 1. The Federal system has, for some time, provided for compulsory examination of a defendant for the purpose of establishing competency to stand trial. *See* 18 U.S.C. § 4244. However, this statute expressly provides that the accused's statements may not be used against him "on the issue of guilt." Until fairly recently, the right of the prosecution to compel examina-

tion of an accused to establish his capacity at the time of the alleged crime, where recognized as existing, has depended upon the inherent power of the court to issue such an order as a condition to permitting the accused to raise the insanity defense. *See United States v. Malcolm,* 475 F.2d 420 (9th Cir.1973); *State v. Whitlow, supra;* and cases cited therein.

Since 1975, Fed.R.Crim.P. 12.2 has provided that a defendant who wishes to raise "the defense of insanity at the time of the [commission of the] alleged crime" must give notice to the attorney for the government, and, in appropriate cases, "the court may, upon motion of the attorney for the government order the defendant to submit to a psychiatric examination." However, "[n]o statement made by the accused in . . . any [such] examination . . . shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding." Thus, the Federal procedure recognizes a distinction between competency to stand trial and capacity (sanity) of the accused at the time of the commission of the alleged offense, and provides for compulsory psychiatric examinations in both instances, though in differing manners. *See United States v. Leonard,* 609 F.2d 1163 (5th Cir. 1980).

Military law, based upon different legislative and executive precedents, has developed differently from civilian law, even though on a largely parallel course. The Manual for Courts-Martial recognizes the defense of insanity and that the burden of proving sanity is upon the Government. "If a reasonable doubt exists as to the mental responsibility of the accused for an offense charged, the accused cannot be legally convicted of that offense." Para. 120*b,* Manual, *supra.* It recognizes the defense of incompetency to stand trial. "No person should be brought to trial unless he possess-

---

ty. In that case, the defendant introduced no psychiatric evidence nor gave any indication that he might do so. Under those circumstances, "[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here." *Id.* at 467,

101 S.Ct. at 1875. "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468, 101 S.Ct. at 1876.

es sufficient mental capacity to understand the nature of the proceedings against him and to conduct or cooperate intelligently in his defense." Para. 120d, Manual, supra. It provides a procedure for acquiring evidence to resolve these questions, either before, during, or after trial:

If it appears to any commanding officer who considers the disposition of charges ... or to any investigating officer ..., trial counsel, or defense counsel that there is reason to believe that the accused is insane ... or was insane at the time of the alleged offense ..., that fact and the basis of the observation should be reported through appropriate channels in order that an inquiry into the mental condition of the accused may be conducted before trial. When the report indicates a reasonable basis for the belief, the matter will be referred to a board of one or more medical officers for their observation and report as to the sanity of the accused.... The board ... should be required to make separate and distinct findings as to each of the three following questions:

a. Was the accused at the time of the alleged offense so far free from mental defect, disease, or derangement as to be able concerning the particular acts charged to distinguish right from wrong ...?

b. Was the accused at the time of the alleged offense so far free from mental defect, disease, or derangement as to be able concerning the particular acts charged to adhere to the right ...?

c. Does the accused possess sufficient mental capacity to understand the nature of the proceedings against him and to conduct or cooperate intelligently in his defense ...?

Para. 121, Manual, supra.

In addition, the Manual establishes the procedures for litigating these same matters before the court-martial. See para. 122 b, Manual, supra.

Where the defense proffers expert testimony concerning the accused's mental responsibility or capacity, the accused may be required to submit to psychiatric evaluation by Government psychiatrists as a condition to the admission of defense psychiatric evidence.

Para. 122b(2), Manual, supra.

In United States v. Babbidge, 18 U.S.C. M.A. 327, 40 C.M.R. 39 (1969), we upheld the constitutionality of paragraph 121, even though it compelled an accused wishing to raise the insanity defense to submit to examination by government psychiatrists.

When the accused opened his mind to a psychiatrist in an attempt to prove temporary insanity, his mind was opened for a sanity examination by the Government. His action constituted a qualified waiver of his right to silence under Article 31 [UCMJ, 10 U.S.C. § 831].

Id. at 332, 40 C.M.R. at 44. However, this holding went only to testimony as to the issue of the accused's sanity, and "we note[d] the absence of any showing that anything Babbidge may have said tended to prove he committed an offense." Id. at 333, 40 C.M.R. at 45; see also United States v. Wilson, 18 U.S.C.M.A. 400, 40 C.M.R. 112 (1969). In Wilson, and United States v. Schell, 18 U.S.C.M.A. 410, 40 C.M.R. 122 (1969), we recognized that the testimony of the psychiatric experts as to the accused's sanity, based on statements made by the accused at the sanity board, was admissible whether or not the accused was advised of his rights under Article 31, 10 U.S.C. § 831.

However, another aspect of military law injected a further problem into this area of tension. Historically, military law has recognized no privilege attaching to communications between military personnel and military doctors. See United States v. Wimberley, 16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966). What then happens to statements made to a military doctor (psychiatrist) by an accused at a sanity board hearing? Are they admissible against the accused at trial? Further, if the accused is read Article 31, can he meaningfully exercise his rights against self-incrimination when he is, at the same time, forced to cooperate with the sanity board as a precondition to his exercise of the insanity defense? These questions were raised by the defense counsel in

*United States v. Johnson,* 22 U.S.C.M.A. 424, 47 C.M.R. 402 (1973), as part of his motion to have the accused examined by a civilian psychiatrist. Instead, the military judge required that the examination be conducted by military psychiatrists, but put severe limitations on the dissemination of the report of the board. We approved that procedure on the grounds that the military psychiatrists were professionals and that their determinations as to the accused's sanity would be impartial and that the accused would have no more privilege as to his statements made to a civilian psychiatrist since "[t]he question of privilege is governed by the law of the forum in which the witness testifies. Wigmore, Evidence § 5 (3d ed.)." *Id.* at 428, 47 C.M.R. at 406.

We again addressed these questions in *United States v. Frederick,* 3 M.J. 230 (C.M.A.1977). There we noted "that while *Babbidge* permits a psychiatric examination without advising an accused of his Article 31 rights, normally only expert conclusions as to his mental condition are admissible— not the statements of an accused which were made during the examination." *Id.* at 233. However, in that case the court order required that the accused be advised of his Article 31 rights during the initial psychiatric examination, and the report of the psychiatrists involved indicated that the accused was so advised, although the substance of the advice was not reflected in the record. In addition, the military judge instructed the members that the statements of the accused which were admitted before the court "were limited to the issue of mental responsibility." *Id.* at 234 n. 7. We also noted that "[t]he original references to the statements in question were made upon direct examination by the defense counsel." *Id.* at 234. With the record in that posture, we held that the statements were properly admitted into evidence for the limited purpose of establishing the accused's sanity.

■ Turning now to the instant case, the accused was first examined by government psychiatrists. However, after the report of the government experts, the accused was again examined by civilian doctors of his choice. During the cross-examination of the accused's civilian psychiatrist, the substance of the accused's admissions concerning the events of the shooting came before the members over objection by the defense counsel.[5] This arose in the context of determining why, in the opinion of the doctor, the accused shot the victim. The psychiatrist answered with a description of the accused's psychiatric makeup. In an attempt to obtain a more specific answer, trial counsel asked several questions concerning statements made by the accused to the victim:

Q. Didn't the accused tell you that he shot Drury because Drury would not get down on his knees and beg him not to?

A. That was the approximate cause. The immediate cause.

Q. What did the accused tell you that he told Drury prior to shooting him? What were his words?

A. Something like, "Get down on your knees, or I'm going to shoot you." Something to that effect.

Q. And then Drury—

A. "Get down and beg." Something along those lines.

Q. And when Drury didn't do that, he then shot him?

A. That's correct.

DC: Unless counsel is willing to look [sic] that up, I ask that that question and response be stricken and cautionary instructions be given to the members.

MJ: I'll give a cautionary instruction, but I'm not going to strike the testimony.

It is clear that trial counsel was seeking to relate the psychiatrist's diagnosis of the accused's personality disorders in terms of the details of the accused's mental state at the time of the shooting.[6] However, the inten-

5. This was not raised specifically in the defense-framed issue which addresses only the legality of the compelled examination that the insanity plea has prompted; however, we believe that it was fairly encompassed within that issue.

6. Defense counsel's objection appears directed towards only the last answer which does go to

tion of the accused at the time of the shooting was, at that point in the trial, the sole remaining issue for the members. Consequently, while it was proper for trial counsel to probe the basis for the psychiatrist's opinion, the relation of the accused's statements also had a bearing on the issue of premeditation which is part of the charge of murder with malice aforethought.

At the conclusion of the psychiatric testimony from both sides, the military judge gave this instruction:

> At this time I want to give you an instruction on these statements that you have heard from these witnesses today. We're not talking about the witnesses you heard yesterday. We're talking about the expert witnesses and the statements they have made as to statements made by the accused and facts related to them or events related to them by the accused. Now, I'll give you a more complete instruction on this later but right now I want to tell you that you are to consider those statements only on the sanity of the accused and not on the guilt or innocence of the accused. You are to consider those statements only in regard to whether or not the accused was sane.

In his closing instructions, the military judge further advised the members:

> As I indicated to you yesterday, during the testimony of Doctors Carlton, Chandler, Paden, Ratner and Shapiro, there was testimony regarding certain statements made by the accused at the sanity

board hearing and at the interviews with the defense experts. These statements are admissible only for the limited purpose, namely in deciding the issue of the accused's mental responsibility at the time of the offense and his partial mental responsibility that I just instructed you on. Thus you may consider these statements on that issue alone, and you cannot consider those statements in determining whether or not there is sufficient proof beyond a reasonable doubt of the offenses charged.

■ Thus, we are presented with a classic example of the compulsory-examination conflict with the right against self-incrimination. Accepting that the Government must have a right to cross-examine the defense experts as to the basis for their opinions,[7] the problem of preventing prejudice to the accused from the relation of statements he made which formed the diagnostic predicate is difficult to resolve. Civilian courts have attempted to avoid the difficulties in a variety of ways ranging from complete exclusion of any statements of the accused,[8] bifurcated proceedings,[9] sequential proceedings,[10] and limiting instructions from the judge.[11] Since we are operating with a different statutory and regulatory scheme, such precedents are of little value.

The procedures followed in this case are in line with our precedents. The accused was given a detailed advisement of his Article 31/*Miranda-Tempia* rights.[12] *Cf. Estelle*

---

the ultimate question for the fact finders. The military judge's limiting instructions went to the entire line of questioning.

7. *See* cases cited in *United States v. Albright, supra* 388 F.2d at 726 n. 9, and *State v. Whitlow, supra* 210 A.2d at 773 n. 3.

8. *United States v. Leonard,* 609 F.2d 1163 (5th Cir.1980).

9. *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975), and cases cited therein; *State v. Raskin, supra; see also* Notes of Advisory Committee on Rules, following Fed.R.Crim.P. 12.2, 18 U.S.C.A. Fed.R.Crim.P. at 246.

10. *See* discussion in *United States v. Alvarez, supra* at 1051.

11. *State v. Whitlow, supra* 210 A.2d at 773; *cf. United States v. Albright, supra* 388 F.2d at 726 n. 9.

12. Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831/*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). Here, the accused was given a detailed advisement of his Article 31/*Miranda-Tempia* rights before his examination by government psychiatrists. The senior member of the board testified as to the specifics of the advisement:

> Initially, he was asked if he understood what he was there for and what that was about. He explained that he understood it was the board of medical officers that were essential-

*v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The results of the Government's examination were made available to the civilian experts. The challenged questions by the trial counsel arose in the context of attacking the credibility of the civilian psychiatrist by revealing the underlying factual basis for his opinion rather than being an obvious attempt to put the statements *qua* statements before the members as admissions or a confession. Further, there was ample evidence *aliunde* the statements upon which the members could find beyond a reasonable doubt that the accused had the required premeditation to commit murder. Finally, and most significantly, the military judge twice gave limiting, curative instructions to the members as to the proper usage of the statements. In this regard, we agree with the Supreme Court of New Jersey.

We are aware of the force of the criticism advanced by some persons as to the difficulty of making a jury of laymen realize the full significance of an instruction by a trial court that they can consider inculpatory statements of an accused to an examining State psychiatrist only on the issue of insanity, and not at all on the issue of guilt. But reception of evidence for a limited purpose is not an uncommon or unsanctioned practice.

ly going to examine him for sanity and that his lawyer had talked to him about that and his lawyer had explained that it could be used against him but it might be helpful to him and that he should cooperate with us. He was then told specifically, I'm not sure in what order, but was told that he didn't have to talk to us ... if he didn't want to. That he had the right to have a lawyer. That he had a right to have his lawyer present. That he could stop talking to us at any time. He didn't have to continue if he didn't want to. That he could stop talking to us and call his lawyer at any time if he wasn't sure if he should keep talking to us. That he had the right to have a civilian lawyer but he would have to pay for that. And it again was explained to him that what he said could be used against him by the prosecutors in the trial.

The Navy Court of Military Review held in *United States v. Duwors*, 6 M.J. 957 (N.C.M.R. 1979), *pet. denied*, 7 M.J. 262 (1979), that where the accused is advised of his rights un-

And we accept, as we must, the fact that jurors can and do obey the court's restrictive instruction with respect to such evidence.

*State v. Whitlow, supra*, 210 A.2d at 773.

Finding no error prejudicial to the substantial rights of the accused, we affirm the decision of the United States Navy-Marine Corps Court of Military Review.[13]

EVERETT, Chief Judge (concurring):

For an insanity defense an accused usually needs expert testimony; and, in practice, this requires that he be examined by a psychiatrist. While his self-interest may "compel" him to submit to an interview by a psychiatrist so that he may have some chance of obtaining an acquittal, Article 31[1] and the Fifth Amendment[2] are not concerned with such "compulsion." Therefore, when an accused has been interviewed by a psychiatrist at his own request, the privilege against self-incrimination does not bar receipt in evidence of statements made to that psychiatrist, even with respect to matters other than sanity. Since military law does not recognize a doctor-patient privilege, an accused cannot invoke such a privilege to exclude from evidence statements which he has made to his own psychiatrist. Thus, in the absence of some Military Rule of Evidence to the contrary,[3] I see

der Article 31, prior to examination by government psychiatrists, his statements were admissible on the merits of the case. This holding goes beyond any of our precedents and is disapproved.

13. Appellate defense counsel argue that we should apply Mil.R.Evid. 302. Since this case was tried before September 1, 1980, the effective date of the new Military Rules of Evidence, we must apply the procedures and precedents in effect at the time of trial. Construction and interpretation of Mil.R.Evid. 302 must await a future case.

1. Uniform Code of Military Justice, 10 U.S.C. § 831.

2. U.S. Const. amend. V.

3. Mil.R.Evid. 302(a) gives the accused a privilege with respect to statements made by him at a mental examination ordered pursuant to the Manual for Courts-Martial, but does not by its

no bar to the cross-examination of a defense psychiatrist about statements made to him by the accused and the unrestricted consideration of such statements by the trier of fact.

The Manual for Courts-Martial authorizes a compulsory mental examination under certain circumstances. *See* para. 121, Manual for Courts-Martial, United States, 1969 (Revised edition); *United States v. Babbidge,* 18 U.S.C.M.A. 327, 40 C.M.R. 39 (1969). Since interviews of the accused will normally be part of that examination, problems of self-incrimination are presented. However, along with several other courts, we have held that an accused's right to offer expert testimony concerning his mental responsibility may be conditioned on his submission to such an examination. *United States v. Babbidge, supra. See also* Mil.R. Evid. 302(d); *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). When the purpose of a mental examination is to determine the accused's sanity at the time of an alleged offense, presumably it will be helpful—often probably essential— for the psychiatrist to discuss with the accused the events connected with that offense. If the accused declines to discuss these events, so that the psychiatrist cannot form an opinion about the accused's mental responsibility, this lack of cooperation may permit the Government to bar the defense from offering its own expert testimony. *Cf.* Mil.R.Evid. 302(d).[4] Thus, an accused is under considerable pressure to cooperate fully with a psychiatrist who conducts a mental examination ordered pursuant to paragraph 121 of the Manual for Courts-Martial. Under such circumstances, a simple Article 31(b) warning to the accused of his right to remain silent is somewhat misleading, for by his silence, an accused may forfeit an insanity defense. Indeed, it can be argued that, despite the giving of such warnings, statements made by an accused during a mental examination which has been directed by the convening authority or the military judge should not be admissible on the issue of guilt or innocence.[5] Presumably, the draftsmen of Mil.R.Evid. 302(a) accepted this argument in providing for the privilege granted there.[6]

Since the psychiatrist's opinion about an accused's mental responsibility may be based on his statements, a psychiatrist testifying for the Government on direct examination may not be able to explain adequately the basis for his opinion if he is not allowed to relate such statements. However, if he does recite these statements, they may affect the factfinder's determination as to issues other than mental responsibility. Similarly, if a defense psychiatrist cannot be questioned on cross-examination about the accused's statements to him, the cross-examiner's right to test the accuracy of the expert's opinion is curtailed. *Cf. United States v. Richardson,* 15 M.J. 41 (C.M.A.1983). While in future cases a different result may be required by reason of Mil.R.Evid. 302—a matter on which I express no opinion—I am convinced that in appellant's case the military judge properly dealt with the dilemma. His instructions to the court members carefully delineated the

terms purport to apply to a mental examination conducted by the accused's own psychiatrist. Mil.R.Evid. 302(c), which concerns release of evidence, applies to defense experts. In its present form, Mil.R.Evid. 302(b)(2) deals only with an expert witness for the prosecution.

4. If the defense evidence has already been received, a motion to strike would be the Government's remedy.

5. 18 U.S.C. § 4244 provides that "[n]o statement made by the accused" in evaluating "his sanity or mental competency" pursuant to that "section ... shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding." That section does not apply to courts-martial. *United States v. Babbidge,* 18 U.S.C.M.A. 327, 40 C.M.R. 39 (1969). Conceptually, the dichotomy it seems to make between "guilt" and "sanity" is false, since in Federal criminal law—as in military law—sanity relates to guilt or innocence and there is no verdict of "guilty but insane".

6. *United States v. Duwors,* 6 M.J. 957 (N.C.M. R.1979), *pet. denied,* 7 M.J. 262 (N.C.M.R.1979), is contrary to the principle stated in Mil.R.Evid. 302(a). However, in the absence of such a Rule, I am not sure that *Duwors* is in error, so at this time I am unwilling to join my two Brothers in disapproving the opinion.

purposes for which they might consider statements by the accused which had been recited by various expert witnesses.[7] While here, as in other cases, the judge's instructions may have been ignored by the factfinder, I perceive no special risk of such irresponsibility in the case at bar. Moreover, as to all issues other than mental responsibility, the accused's statements were only cumulative evidence of matters amply established otherwise by the prosecution. Accordingly, I join the lead opinion.

FLETCHER, Judge (concurring in the result):

Serious questions have existed for a long time concerning the logical consistency of the decisions of this Court which treat compulsory sanity examinations of a military accused by government psychiatrists. *See* Holladay, *Pretrial Mental Examinations Under Military Law: A Re-examination,* 16 A.F.L.Rev. 14, 29 (No. 3, 1974) [hereafter cited as Holladay]. Tifford, *Babbidge: A Time For Change,* 25 JAG J. 133, 137 (1971); *see also* Lederer, *Rights Warnings in the Armed Services,* 72 Mil.L.Rev. 1, 22–23 (1976). The majority opinion ameliorates this problem to a certain extent by disapproving the opinion of the United States Navy Court of Military Review in *United States v. Duwors,* 6 M.J. 957 (1979), *pet. denied,* 7 M.J. 262 (1979), as a legitimate offspring of this Court's decisions. The latter opinion holds that if a military accused is advised of his Article 31 rights prior to a sanity board examination, which is necessitated as a condition for his raising the defense of insanity by his own medical experts, incriminating statements made during this examination are admissible against him on the merits of his guilt or innocence. I agree with the majority opinion's disapproval of *Duwors.*

The majority opinion nonetheless resolves the granted issue in part on a basis which I cannot accept without further clarification. It notes that in accordance with our precedents, appellant was given a detailed advisement of his Article 31 [1]-*Miranda-Tempia* [2] rights by the government psychiatrists prior to his making incriminating statements to the sanity board. It implies that compliance with this procedure somehow undermines appellant's claim that he was prejudiced if the members improperly considered his subsequent statements on the merits of this case. How does it?

Our precedents provide only that such statements may be admitted at a court-martial by the Government on the question of the accused's mental responsibility. *See United States v. Frederick,* 3 M.J. 230, 233 (C.M.A.1977); *United States v. White,* 19 U.S.C.M.A. 338, 41 C.M.R. 338 (1970). The advice given to appellant in the present case must be viewed in this context. Accordingly, I fail to see how appellant's decision to make incriminating statements to these government doctors can be construed as some indication that he was not prejudiced if the members considered his statements on the merits.

This holding also ignores the facts of the present case. There was an express agreement in this case between trial counsel and defense counsel made prior to appellant's sanity-board examination. It provided that "any statements made by him during the board's inquiry would not be introduced unless the defense raised the issue of mental responsibility at trial and would only be used then with respect to the limited issue of mental responsibility." *United States v.*

---

7. The instructions were consistent with the pretrial stipulation that statements made by Parker during the inquiry by the sanity board appointed under paragraph 121 of the Manual would only be used with respect to mental responsibility. Of course, voluntary stipulations by the parties as to the admissibility or inadmissibility of evidence should be given effect unless clearly contrary to public policy. *See, e.g.,* Annot., 53 ALR 3d 1005 (Admissibility of Lie Detector Test Taken Upon Stipulation

That The Result will be Admissible in Evidence).

1. Uniform Code of Military Justice, 10 U.S.C. § 831.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

*Parker,* 11 M.J. 757, 760 (N.M.C.M.R.1981) (footnote omitted). Surely, this agreement, not the subsequent advice of the sanity board, dictates a conclusion that appellant could be prejudiced if the members considered his statements on the question of his guilt or innocence.

More particularly, appellant in this case cooperated with the government psychiatrists as a condition to his raising the defense of insanity by the testimony of his own experts.[3] *See United States v. Babbidge,* 18 U.S.C.M.A. 327, 40 C.M.R. 39 (1969); *Estelle v. Smith,* 451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981). Since appellant chose to raise the defense of insanity in this manner, he had no right under the fifth amendment[4] or Article 31 to refuse to make inculpatory statements to these medical examiners. *United States v. Wilson,* 18 U.S.C.M.A. 400, 40 C.M.R. 112 (1969). The doctors' opinions and his statements after proper advice could only be admitted at trial on the issue of his sanity. *United States v. White, supra. See United States v. Albright,* 388 F.2d 719, 725 (4th Cir.1968); *see also United States v. Leonard,* 609 F.2d 1163 (5th Cir.1980). This in fact was the understanding of trial counsel and defense counsel in the present case as demonstrated by their written agreement.

The advisement of rights under Article 31 and *Miranda-Tempia* by the sanity board in this context (*cf. Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982)), does not unqualify the "qualified nature" of appellant's waiver. For this to occur, the sanity board would have been required to particularly advise appellant that the purpose of the inquiry was for a much broader objective than to permit the Government a fair opportunity to acquire expert testimony on the question of his mental responsibility at the time of the offense. *Estelle v. Smith, supra* 451 U.S. at 465, 101 S.Ct. at 1874. Under the circumstances of this case appellant should have been advised that the Government intended to use his statements on the merits

of his guilt or innocence; that this use of his statements was not required as a condition to his raising the defense of insanity; that this intended use was in contravention of his earlier agreement with trial counsel; and that he could refuse to permit this use of his statements on the basis of Article 31 and the fifth amendment. *Id.* at 468–69, 101 S.Ct. at 1875–1876. This did not occur in the present case. Accordingly, the majority opinion is incorrect in asserting that the advice given by the sanity board indicates that appellant could not have been prejudiced by consideration of the challenged evidence on the merits of this case.

Acknowledging my disagreement with the majority opinion, I nonetheless must vote to affirm appellant's conviction. The assigned issue in this case asks whether appellant was prejudiced in his case on the merits by the admission of the challenged testimony on the issue of his mental responsibility. *See United States v. Bennett,* 460 F.2d 872, 878–82 (D.C.Cir.1972). In view of other circumstances in this case, I find no prejudice.

First, an essential issue on the merits of appellant's guilt or innocence of this murder charge was whether he killed the victim Drury with premeditation. Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. In other words, did appellant shoot and kill Drury after he consciously conceived the thought of taking this person's life and acted in accordance with this intention? *See para.* 197*b,* Manual for Courts-Martial, United States, 1969 (Revised edition). The Government called several witnesses who testified to a series of hostile incidents between appellant and the victim immediately prior to the shooting. Two of these witnesses, Lance Corporal Clough and Lance Corporal Christie testified that appellant told them that there was going to be "some trouble" or a fight between him and Drury. Private Gomez testified that appellant, prior to receiving his pistol and

---

3. I seriously doubt that the doctor-patient privilege has any applicability in this situation. *See McCormick's Handbook of the Law of Evidence* §§ 98–105 (2d ed. 1972).

4. U.S. Const. amend. V.

157

rounds for sentry duty, mumbled that he was going to get Drury. Sergeant Ledbetter further testified that the victim, before he died, stated that appellant shot him "on purpose." The existence of a premeditation to kill on the part of appellant could be inferred from these circumstances. Para. 197, Manual, *supra*.

Second, defense counsel, in his opening argument at trial, stated that he would rely on the insanity defense. The theory of the defense and the evidence it introduced at trial concerned appellant's lack of mental capacity to control his conduct in accordance with the law and his inability to form a specific intent to kill the victim Drury. He called no witnesses to contradict the testimony of the aforementioned government witnesses. Under these circumstances and except for the question of appellant's mental responsibility (para. 120, Manual, *supra*), the defense virtually conceded the fact that appellant did the charged act with the requisite intent. *See United States v. Bennett, supra* at 879 n. 24.

Third, during its case-in-chief, the defense called two expert witnesses, Doctor Shapiro and Doctor Ratner, to raise the issue of appellant's mental responsibility at the time of the offense. *See* para. 122*a*, Manual, *supra*. Prior to trial, appellant requested that these doctors examine him on the question of his mental responsibility and voluntarily made statements to them concerning his involvement in the alleged crimes. *See United States v. Frederick*, 3 M.J. 230, 233 (C.M.A.1977); *United States v. Wimberley*, 16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966). On direct examination, the doctors provided the court-martial with their expert opinions, but only generally stated that these opinions were based in part on statements made by appellant during their examinations.

The Government, in its cross-examination of these witnesses, questioned the doctors on the basis of these opinions, including statements made by appellant. *See* para. 138*e*, Manual, *supra*. The doctors testified that appellant stated in substance that he intended to humiliate the victim for past

slights by forcing the latter to get on his knees and beg for mercy at the point of a gun. This is substantially the same account of the incident which the government psychiatrists later testified appellant related to them during the course of their interviews. The military judge instructed the members that any statements of the appellant contained in this psychiatric testimony were only to be considered on the issue of appellant's mental responsibility at the time of the offense.

It is well-established that the Government has the right to cross-examine a defense witness on the issues concerning which he has testified on direct examination, and on his credibility. *See* para. 149*b* (1), Manual, *supra*. Here the defense witnesses provided the court with their expert opinions on appellant's mental condition at the time of the offense, which in part were based on his incriminating statements. To the extent that these statements were a basis for these opinions, they were matters that the members of the court-martial might properly consider in evaluating the weight to be given these opinions. Para. 138*e*, Manual, *supra*. *See also* C. Wright, *Federal Practice and Procedure* § 455 n. 7 (1982). The fact that the experts did not disclose the specific contents of these statements during their direct testimony does not negate their relevance to these opinions or shield them from inquiry on cross-examination. *See Battie v. Estelle*, 655 F.2d 692, 702 n. 22 (5th Cir.1981).

A question exists whether the defense psychiatrists can be compelled to answer the questions of the trial counsel concerning statements made by appellant during their examinations. *See Gholson v. Estelle*, 675 F.2d 734, 741 n. 6 (5th Cir.1982). In view of the military judge's instructions, this testimony was elicited on cross-examination for the purpose of providing a basis for weighing the experts' opinion on appellant's mental responsibility at the time of the offense. *See* para. 138*e*, Manual, *supra*. Moreover, there is no claim by the defense that these statements were irrelevant for this purpose. It is clear however, that these statements

also are pertinent to the question of whether appellant murdered Drury with premeditation. *See United States v. Bennett, supra* 460 F.2d at 879.

Appellant voluntarily chose to consult these civilian doctors in regard to his defense of insanity. He also voluntarily chose to make incriminating statements to these doctors in the hope of fostering this defense. *Cf.* Holladay, *supra* at 20. Appellant was not forced to raise the defense of insanity at trial (para. 122, Manual, *supra*) or compelled to do so by means of expert testimony. Under these circumstance and in view of the limited use of these statements to the question of mental responsibility, this cross-examination cannot be said to violate his fifth amendment or Article 31 rights.

An additional argument might be made that although the statements are relevant and proper matter for inquiry on cross-examination, their disclosure would be too prejudicial with respect to appellant's defense on the merits. *See United States v. Bennett, supra. See also* Fed.R.Evid. 403; Article 36, UCMJ, 10 U.S.C. § 836. Such an argument is unpersuasive in the present case. First, substantial evidence on the question of premeditation had already been properly introduced at trial by the Government. Second, the defense made no attempt at trial to contest this evidence or this issue on the merits. Third, the military judge specifically instructed the members that they could only consider these statements on the issue of appellant's sanity at the time of the offense and not on the question of his guilt or innocence. Fourth,

appellant made no objection to the disclosure of these statements by Doctor Shapiro on cross-examination, and with respect to Doctor Ratner, his objection was belated and not particularly directed to this point.

In summary, I conclude that the testimony of the defense experts as to incriminating disclosures made by appellant was properly before the members of the court-martial. This testimony was substantially similar to the testimony of the government psychiatrists concerning disclosures made to them by appellant. *See United States v. Albright, supra* 388 F.2d at 725–26.

Fourth, the military judge on two occasions clearly instructed the members that any statements of the appellant contained in the psychiatric testimony of the Government's experts could not be used on the question of his guilt or innocence. *See United States v. Bennett, supra* 460 F.2d at 879 n. 26. Such express limiting instructions in all cases might not be adequate to protect an appellant from undue prejudice. *Id.* at 880 n. 29. *See* 8 Moore's *Federal Practice* § 12.2.03[2] (2d ed. 1982). Yet, the previously indicated circumstances in which these instructions were given convince me of their efficacy in the present case.

In conclusion, this Court need not decide today whether Article 31 or the fifth amendment was violated when the military judge admitted the challenged testimony of the government psychiatrists at appellant's court-martial. *Cf.* Mil.R.Evid. 302. The particular circumstances in this case clearly indicate that if error occurred, no prejudice accrued to appellant as a result thereof.