DECISION
HODGSON, Chief Judge:
The accused was convicted of the unpremeditated murder of his infant daughter. The approved sentence extends to a dishonorable discharge, confinement at hard labor for 39 years, 10 months and 18 days, total forfeitures, and reduction to airman basic. The accused argues that the evidence is insufficient to support his conviction and that there was “prosecutorial misconduct” on the Government’s part. Finding no prejudicial error, we affirm.
I
Generally, the facts in this case are not in dispute — only the inferences to be drawn therefrom. The accused was assigned to Korea in February 1981 after being trained in the Korean language. Shortly thereafter he met his wife, a Korean national, and married her in April 1982. Subsequently, a daughter, Michelle Diane, was bom.
By all accounts the accused was a caring and loving father who was thought well of by his associates and who had no history of a violent temper. There was testimony, however, that he would occasionally become frustrated and irritated with his daughter if she began crying and would not stop. On 8 February 1983, the accused finished work at 2130 hours and stopped by *368 the unit lounge where he drank five or six mixed drinks. He left the lounge about midnight and arrived at his off-base apartment a few minutes later. There was some indication his wife was annoyed by the late hour and the drinking, but this soon passed.
The floor in the bedroom is concrete and has a vinyl or linoleum covering. Since the floor is heated the accused’s bed lies directly on it and the baby slept on a blanket next to the bed within reach of her mother. Initially the child was asleep when the accused arrived, but began “fussing” after the mother went to the bathroom. When the accused’s wife returned from the bathroom a few minutes later, she thought the “baby looked strange,” i.e., not breathing and red in the face.
After the accused was unable to aid the infant, his wife went next door to get help from an Air Force couple, Master Sergeant Oliver and his wife. The accused then became hysterical and tried to commit suicide by cutting his left wrist and ingesting oven cleaner. Ultimately the accused and his child were taken by an American and Korean police patrol to the hospital at Osan Air base which is nearby. Without being questioned, the accused indicated to anyone who would listen that he had killed his child, making such statements as: “I killed my baby, didn’t I,” and going on to say, “Maybe its that inner jealousy every parent has toward his child;” “It’s not every day that someone comes home and kills their daughter;” “I’ll probably live to be 100 and all of it will be spent in Leavenworth;” “These two hands killed my baby;” and “I did it. I really did it. I killed my baby. I often talked about it, but I really did it.”
The accused’s daughter was pronounced dead at 0250 hours, 9 February 1983. An autopsy was conducted the next day by Major (Dr.) Jack C. Chaffin, Jr., a pathologist assigned to the United States Army in Korea. Doctor Chaffin described the cause of death in the following manner:
Michelle died of blunt force of a great degree applied to the back of the head resulting in a severe, massive skull fracture and severe brain damage, which was the direct cause of death. The amount of force which is required is far greater than could be accounted for by a fall or by a mechanism conceivable. It could occur in a forceful slamming or throwing of the infant’s body.
It was the largest fracture he had seen in a human body, and completely encircled the skull. Doctor Chaffin also identified four abrasions on the child’s face from V2 inch to one inch long and a two inch bruise on the upper side of the abdomen. These abrasions were not noticed by Sergeant Oliver, who attempted to revive the child, or by the emergency room physician. The bruise on the abdomen occurred sometime before death, but not beyond two days. Doctor Chaffin testified it was not possible that the injury could have resulted from an accidental fall. Commander (Dr.) Jerry D. Spencer, Chairman of the Department of Forensic Sciences, Armed Forces Institute of Pathology, reached the same conclusion. Doctor Spencer stated the cause of death was “a blunt force injury of the head” which was the result of the victim being “slammed or thrown against a solid surface.” It was his opinion that the injuries were not the result of an accident.
The defense urged that Michelle’s death was accidental and most likely occurred when she fell from her father’s arms to the floor — a distance of approximately 58 inches. This hypothesis was supported by Doctor (PhD) James W. Turnbow, a retired professor of engineering and consultant in aviation and automotive safety. This position was also supported in a lesser degree by Lieutenant Colonel (Dr.) Rolofo Valencerina, a pathologist, and Lieutenant Colonel (Dr.) Ritichie P. Gillespie, a neurosurgeon. Doctor Turnbow opined that the injuries to the back of the head could have occurred in a “free fall of 58 inches.” The prosecution disputed this conclusion through the testimony of Major (PhD) Ronald L. Bagley, an associate Professor of Engineering Mechanics at the Air Force Academy. Doctor Bagley questioned the procedure Doctor Turnbow used to arrive at the high level of *369 acceleration that would have to be achieved to inflict the injury involved as the result of a fall. Doctor Yalencerina was not certain whether the child’s injury was intentional or accidental but thought it “probable” that the injury was intentional. Doctor Gillespie thought it possible for the injury to have resulted from a fall, but it was “unlikely.”
The accused denied intentionally killing his daughter. He testified he remembered picking the child up, but has no recollection of what happened thereafter. Further, he has no memory of the statements attributed to him by friends, police officers and emergency room personnel.
II
At trial the defense moved to disqualify the trial counsel alleging prosecutorial misconduct on her part. See M.C.M., 1969 (Rev.), paragraph 44a. It was their position that she violated paragraph 121 of the Manual and Military Rule of Evidence 302(a)[1] when she interviewed the psychiatrist who examined the accused as a part of the sanity board proceedings.[2] While conceding that the prosecutor told the psychiatrist she was not interested in any statements the accused had made to him, the defense, nevertheless, argued that the interview itself was “forbidden” and a form of “derivative evidence” that materially assisted her in cross-examining the accused and in making a closing argument. The prosecutor asserted, without challenge by the defense, that her purpose in speaking with the psychiatrist was to ascertain if a claim of amnesia was inconsistent with his examination of the accused.
In our view the trial counsel’s actions were proper and within the restrictions imposed by the Manual procedure, Military Rules of Evidence and the case law. Accord United States v. Parker, 15 M.J. 146 (C.M.A.1983); see also United States v. Frederick, 3 M.J. 230 (C.M.A. 1977); United States v. Babbidge, 18 U.S. C.M.A. 327, 40 C.M.R. 39 (1969). Neither the editorial comment nor the drafter’s analysis to Military Rule of Evidence 302 provide any insight as to what constitutes “derivative evidence” beyond suggesting that it might be equated with testimonial immunity, thus making even the “remotest connection” subject to being called “derivative.” See S. Saltzburg, L. Schinasi, and D. Schlueter, Military Rules of Evidence, 63 et seq. (1981). We think it an unwarranted interpretation of the term “derivative evidence” to expand it to include interviews where no attempt is made to gain access to statements given by the accused to his psychiatrist. In the case before us no statement by the accused to his doctor was offered. A prosecutor is permitted to interview an examining psychiatrist. United States v. Parker, supra. What is forbidden is the use of any statements the accused may have made in the course of that interview and any evidence that is derivative of those statements. An assertion that by just talking to a witness, a prosecutor gains improper knowledge on how to proceed with cross-examination and argument falls measurably short of being classified “derivative evidence.”
*370 In the context of this assignment of error we think it appropriate to address what constitutes “prosecutorial misconduct”, which may be defined as an attempt to persuade the fact-finder by deceptive or reprehensive methods. People v. Gilliam, 41 Cal.App.3d 181, 116 Cal.Rptr. 317 (1974). We think the reasonable standard to be applied may be stated thus:
1) A determination that a prosecutor has engaged in misconduct is made by reference to the case law and the disciplinary rules of the code of professional responsibility as adopted by that jurisdiction. [See Air Force Regulation 111-1, Military Justice Guide (7 December 1983), para. 1-9]-
2) Did the misconduct, under all the circumstances, place the accused in a position of grave peril to which he should not have been subjected?
3) Whether the misconduct results in subjecting the accused to grave peril is determined by the probable persuasive effect of the misconduct on the fact-finder’s decision, not by the degree of impropriety of the conduct.
4) Even if an isolated instance of misconduct does not establish grave peril, if repeated instances show a deliberate attempt to improperly prejudice an accused, a reversal may still result.
Maldonado v. State, 265 Ind. 492, 355 N.E.2d 843, 848 (1976); see also Reese v. United States, 467 A.2d 152 (D.C.App. 1983).
The prosecutor’s conduct in interviewing the psychiatrist was permissible, United States v. Matthews, 14 M.J. 656 (A.C.M.R. 1982), and, assuming arguendo it was improper, it was not, under the facts of this case, prosecutorial misconduct.
Ill
We now consider the ultimate issue before us. Does the evidence, the crucial portion being circumstantial, establish the accused’s guilt beyond a reasonable doubt? We hold that it does. The standard of proof in a circumstantial evidence case is no higher than that required in a direct evidence case, United States v. Gammill, 13 M.J. 966 (A.F.C.M.R.1982), and that a homocide conviction results does not change the rule. United States v. Jarvis, 1 U.S.C.M.A. 368, 3 C.M.R. 102 (1952). All that is required to support a conviction for unpremeditated murder resting largely upon circumstantial evidence is a showing that the evidence was of such a nature as to exclude every reasonable hypothesis except that of the accused’s guilt. United States v. Bigger, 8 C.M.R. 248 (A.B.R. 1952), aff'd 9 U.S.C.M.A. 297, 8 C.M.R. 97 (1953). The decisive test is the cumulative effect of all the circumstances considered in toto. United States v. Hurt, 22 C.M.R. 630 (A.B.R.1956); aff'd 9 U.S.C.M.A. 735, 27 C.M.R. 2 (1958).
Certain facts are uncontested — the accused’s infant daughter died as the result of massive injuries to the back of her head. While no one witnessed the “mechanism of injury,” there is compelling — nay overwhelming — evidence that the child was thrown or slammed against a solid surface. The medical testimony from both sides differed- only slightly as to this being the “mechanism of injury.” Sown into this web of circumstances are the multiple statements of the accused to bystanders indicating a high degree of criminal culpability. The defense seeks to soften the impact of these words by suggesting they represent expressions of grief rather than admissions of guilt and urge that the child’s death was an accident. The court also had before it evidence of two suicide attempts by the accused after it was determined that his child was experiencing distress. This is relevant as a circumstance tending in some degree to show consciousness of guilt. 22 A.L.R.2d 840 (1968). Considering all the evidence in this lengthy and vigorously contested trial we, like the members who saw and heard the witnesses, are convinced beyond a reasonable doubt that the accused killed his infant daughter in the manner alleged. Article 66(c), U.C.M.J., 10 U.S.C.A. § 866(c). The *371 facts permit no other conclusion. The findings of guilty and the sentence are
AFFIRMED.
FORAY, Senior Judge, and MURDOCK, Judge, concur.

. These provisions state in part:
Paragraph 121, M.C.M., 1969 (Rev.)
******
No individual, other than the defense counsel, accused or, after referral of charges, the military judge, shall disclose to the trial counsel any statement made by the accused to the board or any evidence derived from that statement. See Military Rule of Evidence 302. [Emphasis supplied].
******
MILITARY RULES OF EVIDENCE Rule 302. Privilege Concerning Mental Examination of an Accused
(a) General rule. The accused has a privilege to prevent any statement made by the accused at a mental examination ordered under paragraph 121 of this Manual and any derivative evidence obtained through use of such a statement from being received into evidence against the accused on the issue of guilt or innocence or during sentencing proceedings. This privilege may be claimed by the accused notwithstanding the fact that the accused may have been warned of the rights provided by rule 305 at the examination. [Emphasis supplied].

. The accused’s sanity was not an issue at trial.