UNITED STATES, Appellee,

v.

Arthur D. STUBBS, Captain U. S. Army, Appellant.

No. 52435.
CM 443721.

U.S. Court of Military Appeals.

Jan. 12, 1987.

For Appellant: *Captain Pamela G. Montgomery* (argued); *Colonel Brooks B. La Grua, Lieutenant Colonel Paul J. Luedtke, Captain Bernard P. Ingold, Captain Annamary Sullivan* (on brief); *Lieutenant Colonel William P. Heaston* and *Captain Harry L. Williams, Jr..*

For Appellee: *Major Robert L. Swann* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Larry D. Williams* (on brief);

*Lieutenant Colonel Gary F. Roberson* and *Major Patrick M. Flachs.*

### Opinion of the Court

EVERETT, Chief Judge:

Captain Stubbs was tried by general court-martial during October and November 1982; and, pursuant to his negotiated pleas, he was convicted of six specifications of larceny of percodan tablets in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921.[1] Thereafter, court members sentenced him to a dismissal from the service, 6 months' confinement, and total forfeitures. The convening authority approved these results, and the Court of Military Review affirmed in an unpublished Memorandum Opinion.

In this Court, appellant renews his complaint—originally made at trial and pursued throughout his appeal—that the military judge committed prejudicial error by failing to grant his motion to recuse the entire prosecution staff of the Office of the Staff Judge Advocate, XVIII Airborne Corps, Fort Bragg. 21 M.J. 275.

## I

Prior to trial, appellant's civilian defense counsel filed several written motions for dismissal or appropriate relief, which were addressed at Article 39(a)[2] sessions before trial on the merits began. One of these, at issue in this appeal, was a motion asking for recusal of all trial counsel assigned to the staff judge advocate's office at XVIII Airborne Corps and Fort Bragg. The basis for the motion concerned one of the judge advocates then assigned to that office, Captain Judith Robb.

The trial brief filed by defense counsel in support of his motion asserts that, from November 1981 and extending into early 1982, Stubbs sought legal advice from Captain Robb, who then was a legal assistance attorney in the staff judge advocate's office. This contact blossomed into an attorney-client relationship; and it concerned the subject matter which later gave rise to the instant charges. Captain Robb represented Stubbs during this time period in an effort to resolve problems administratively. During her representation, Captain Robb heard "through the legal grapevine" that charges on those matters were pending; and she "discussed them at that time and at later times at length with Cpt. Stubbs." In fact, when the charges and specifications actually were preferred, Stubbs prepared a request for Captain Robb to be made available as his individual defense counsel. For some reason, however, it never was submitted. Defense counsel's brief further indicates that, on August 2, 1982, Captain Robb was reassigned within the staff judge advocate's office to be a trial counsel; and, as part of her duties, she was "assigned to share Headquarters Command jurisdiction with the present prosecutor, Cpt. Mike Hoadley."

In response, trial counsel—Captain Hoadley—also filed a written brief. Therein, he conceded that Captain Robb had "formed an attorney-client relationship with the accused CPT Stubbs in November of 1981" in her capacity "as a legal assistance" officer for XVIII Airborne Corps and Fort Bragg. He also acknowledged that, when Captain Robb was transferred on August 2, 1982, to the Criminal Law Section of the staff judge advocate's office to serve as trial counsel, she was "assigned," *inter alia*, "as an assistant [to himself] for Headquarters Command."

According to Captain Hoadley's brief, on July 23, 1982—prior to Captain Robb's transfer—Captain Hoadley had been "assigned full responsibility for the present case, *United States v. Stubbs* ... due to the permanent change of station of the former trial counsel, CPT Campbell." Not-

---

1. Appellant was charged with other offenses as well. However, defense counsel successfully moved for a severance of those charges, so only these six specifications are the subject of this appeal. Appellant's appeal from his subsequent conviction on other charges also has been grant-

ed by this Court. *See United States v. Stubbs,* 21 M.J. 275 (1985).

2. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

withstanding Captain Robb's assignment as his assistant on August 2, Hoadley asserted that "CPT Robb has in no manner whatsoever been involved in the prosecution of any of the charges against the accused, CPT Stubbs. CPT Robb terminated the attorney-client relationship prior to being assigned to the Criminal Law Section."

When litigation of this motion began, civilian defense counsel indicated that apparently he and trial counsel were "awfully close but we're not totally in agreement on the facts." Therefore, he asked to call Captain Robb to testify on the motion. While waiting for her to appear, the military judge referred to the facts recited in the two trial briefs and asked, "Now what's in dispute between the two things, the two sides?" Civilian defense counsel responded, "Your Honor, what's in dispute is the extent to which these, the facts giving rise to these charges and specifications were discussed with Captain Robb" by the accused. After some discussion between the military judge and trial counsel, the military judge asked the prosecutor, "So, as part of that [attorney-client] relationship and under its cloak, so to speak, you are agreed that the accused made disclosures to Captain Robb about the matters to which these present charges pertain." Trial counsel responded: "Yes, your honor. The only thing that would be in dispute is the extent of that disclosure."

At this point, Captain Robb arrived in the courtroom and was called to testify on the motion. Captain Robb indicated that Stubbs had first come to her concerning a proposed "letter of reprimand" about a "prescription writing incident." At that time she had no idea that the matter would develop into court-martial charges. She continued that, later, "there was some rumblings from the higher-ups in his chain of command, that all of a sudden this would no longer be administrative. However, I was flabbergasted when it actually turned out to become criminal." When she first heard the rumblings, Captain Robb indicated that she did discuss the subject matter of those rumblings to some extent with

Stubbs, during which she "offer[ed] him, I think, more consolation than advice at that time." However, Captain Robb left no doubt through her testimony that Stubbs had discussed with her in some detail the conduct which later served as the bases of the court-martial charges. She indicated that in those discussions Stubbs had steadfastly insisted that the "charges . . . were completely unfounded and he was totally innocent." Concerning one of the specifications, however, Captains Robb and Stubbs even discussed possible motives for one of the complainants to have made her allegations and discussed who might have convinced her to do so.

After Captain Robb had been excused, the military judge turned to counsel, and the following exchange occurred:

MJ: Okay, aside from what Captain Robb has told us, she—we know that during this period, 8 December until a few days after the 26th of April, this attorney/client relationship in general existed between herself and the accused, which had had as its basic focus some administrative matters which are not directly related to these charges. As a matter of fact, we know what that was; basically, it was about the prescription writing on the 22d of May which was the subject of the letter of reprimand that we've heard about in the case; and then, shortly after the charges were preferred, the attorney/client relationship was clearly terminated and [on] 2 August Captain Robb became a trial counsel in the Corps SJA office. She was assigned responsiblities for MEDDAC and the Airborne Board and also was assigned to assist Captain Hoadley for Headquarters Command and the 525th MI Group. As a matter of fact, Captain Hoadley, beginning on the 23d of July, had full responsibility for this case. Captain Robb has made no disclosures to anyone about what her former client had said to her and has

not been involved in any manner in the prosecution of the case against this accused. That's what I glean from what I've heard so far by way of testimony and the factual recitations from the two motions. Is there any party that disagrees with any of that?

CDC: I don't disagree with that, your honor.

TC: The government doesn't disagree.

Then, the military judge indicated that "[i]t might be useful to get into the equation something about what is this, this institution, the 'Prosecutors Branch of the Office of the SJA of XVIII Airborne Corps.'" After it was established that it consisted of four prosecutors headed by a field-grade officer acting as the Chief of Military Justice, the military judge submitted:

MJ: All right. These prosecutors are assigned responsibilities for advising and representing the government in connection with the cases arising in the various subordinate jurisdictions of XVIII Airborne Corps. Examples have been noted in the previous recitation. The offices, physical offices, are located on one floor, a portion of one floor, of the building occupied by the SJA and joining offices accessible by one single hallway. I think we can safely say that ordinarily the counsel discuss their cases with each other from a professional, one would imagine, from time to time even from a recreational or gossiping point of view, but in any way professional discussions take place with some regularity between counsel. However, in this case no such discussions have taken place between Captain Robb and any of the prosecutors assigned to this office pertaining to this case. Is that fair? I'm reading between the lines. Is that agreed? All of that?

TC: Yes, your honor.

MJ: Mr. Byrd?

CDC: Your honor, I have no information to indicate that that is not absolutely correct.

MJ: Okay. Well, we'll take that as a fact then.

(Defense counsel nodded his head.)

MJ: I see Captain Mosakowski [detailed defense counsel] would agree.

DC: Yes, sir.

Indicating to civilian defense counsel that "you have the burden, Mr. Byrd," the military judge gave each side an opportunity to argue on the motion, and each relied on their respective briefs. Thereupon, the military judge ruled:

MJ: Well it's clear that there was no, no actual impropriety here. But for the fact that there was nothing to disclose, there would have, however, been an appearance of impropriety in having Captain Robb working for Captain Hoadley and have them working together with responsiblity for one of the jurisdictions. However, since to my satisfaction based on the evidence it's been established that there was no communication by the accused to Captain Robb about any matter of any substance whatsoever concerning these charges, no appearance of impropriety can arise. That being the case, I'm constrained to deny the motion, though I certainly don't commend the practice willy-nilly, mixing up people who are in the position that Captain Robb was with people who may be called upon to prosecute former clients of their associates. To put it another way, if there had been anything of communication from which an impropriety could have arisen, I would have granted the motion. Because there wasn't, the motion is perforce denied.

II

Before this Court, appellant correctly points out that "the government concedes ... [that] Captain Robb was disqualified

from prosecuting the appellant in view of the nexus between her discussions with the appellant and the charges in this case." In fact, appellate government counsel acknowledges: "The Government agrees that had Captain Robb been assigned to prosecute appellant, she would have been disqualified from so doing. There was, at best, a [']logical nexus' between the conversations she had with appellant and with the charges he faced." The issue then becomes whether Captain Robb's disqualification as prosecutor in this case required recusal of her colleagues on the prosecution staff.

Initially, appellant relies on an interpretative interplay between two elements of the American Bar Association's Model Code of Professional Responsibility. Canon 9 of the Model Code admonishes, "A lawyer should avoid even the appearance of professional impropriety." More specifically, Disciplinary Rule 5–105(D) instructs, "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment."

■ However, as was recognized in *United States v. Caggiano*, 660 F.2d 184, 190–91 (6th Cir. 1981), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 303 (1982):

> There is, of course, quite a difference in the relationship between law partners and associates in private law firms and lawyers representing the government. The ABA Committee on Professional Ethics recognized there are substantial reasons against treating the government as a private enterprise in its Formal Opinion 342, 62 A.B.A.J. 517 (1976). The Committee discussed the situation similar to this case where a lawyer leaves a private practice for government service. The Committee ruled that other government lawyers in the office are not disqualified from handling matters in which their new associate was involved in his former practice. The Committee stated:

When the disciplinary rules of Canons 4 and 5 mandate the disqualification of a government lawyer who has come from private practice, his governmental department or division cannot practicably be rendered incapable of handling even the specific matter. Clearly, if DR 5–105(D) were so construed, the government's ability to function would be unreasonably impaired. Necessity dictates the government action not be hampered by such a construction of DR 5–105(D). The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice. The important difference in the adversary posture of the government lawyers is recognized by Canon 7: the duty of the public prosecutor to seek justice, not merely to convict, and the duty of all government lawyers to seek just results rather than the result desired by a client. The channeling of advocacy toward a just result as opposed to vindication of a particular claim lessens the temptation to circumvent the disciplinary rules through the action of associates. Accordingly, we construe DR 5–105(D) to be inapplicable to other government lawyers associated with a particular government lawyer who is himself disqualified by reason of DR 4–101, DR 5–105, DR 9–101(B), or similar disciplinary rules.

The Committee concluded that when the individual attorney is separated from any participation on matters affecting his former client, "vicarious disqualification of a government department is not necessary or wise."

Whether or not one agrees entirely with the rationale of the American Bar Association's Formal Opinion, clearly it rebuffs appellant's view that Disciplinary Rule 5–105(D) disqualifies all government attor-

neys who are associated with an individual who is disqualified to participate in a case.

Appellant is correct, however, that a number of jurisdictions which have considered the situation presented in this case have adopted the approach he now commends to us. *See, e.g., People v. Shinkle,* 51 N.Y.2d 417, 434 N.Y.S.2d 918, 415 N.E.2d 909 (1980); *State v. Latigue,* 108 Ariz. 521, 502 P.2d 1340 (1972); *People v. Stevens,* 642 P.2d 39 (Colo. App. 1981). He also recognizes, though, that other jurisdictions have rejected it in favor of an ad hoc approach. *See, e.g., State v. Fitzpatrick,* 464 So.2d 1185 (Fla. 1985) and cases cited therein at 1187; *United States v. Caggiano, supra.*

We agree with the latter approach. Generally, a per se approach is not desirable from the viewpoint of efficient administration of justice; and it is usually unnecessary. Lawyers and judges, being human, make errors—but not all those errors warrant remedial action. Congress demonstrated its general inclination away from the per se approach when it prescribed in Article 59(a), UCMJ, 10 U.S.C. § 859(a), that "[a] finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."

This Court recognizes that there are unusual instances in which, under compelling circumstances, remedial action is appropriate without regard to an affirmative showing of prejudice. While not detracting in any way from the seriousness with which we view the circumstances of this case, we believe that this is not an instance in which such a reaction is appropriate. We are as concerned as appellant that the appearance of evil be avoided in the administration of military justice. Nonetheless, where it clearly and affirmatively appears that the accused has not been prejudiced by a particular error, there can be no appearance of evil. *See United States v. Thomas,* 22 M.J. 388 (C.M.A. 1986).

Arguing against appellant's suggested approach, the Government has urged this Court, instead, to require appellant to show

that he was prejudiced before he is entitled to some relief. In our view, this approach is not workable: While an accused certainly knows what was said between him and his lawyer and, so, can readily produce evidence thereon, he usually will have no idea what was said or done by that lawyer after the lawyer joins the prosecutor's office.

These considerations lead us to set a standard similar to that which we followed in related circumstances in *United States v. Gardner,* 22 M.J. 28 (C.M.A. 1986). There, assistant trial counsel had been inextricably involved in obtaining the immunized testimony of Gardner, prior to his court-martial, for use in the trial of a co-accused. Recognizing the necessity of safeguarding an accused's fifth-amendment privilege against self-incrimination and recognizing, at the same time, the important role which immunized testimony serves in the administration of justice, we quoted the standard adopted by the Supreme Court for such situations in *Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972):

> "Once a defendant demonstrates that he has testified, under a ... grant of immunity, to matters related to the ... prosecution, the ... authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *[Murphy v. Waterfront Comm'n,]* 378 U.S. [52] at 79 n. 18, 84 S.Ct. [1594] at 1609 n. 18 [12 L.Ed.2d 678 (1964)].

This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. *United States v. Gardner, supra* at 30.

■ Accordingly, we hold that, once the accused shows that he entered into an attorney-client relationship with a particular lawyer concerning the same or related mat-

ters to those being tried at his court-martial and that this lawyer, after terminating the relationship, has joined the prosecutor's office then prosecuting the accused, the Government has the burden of affirmatively demonstrating that no communication whatsoever has occurred between that lawyer and the prosecution staff regarding any aspect of the accused's case. Nothing short of the Government's carrying this burden can ensure that the accused suffered no prejudice resulting from knowledge of the confidences of his earlier relationship with his lawyer. The attorney-client relationship, as well as the need to preserve the unquestioned integrity of the court-martial process, is too sensitive to permit anything less.

## III

■ There is no question from our reading of the record that appellant has carried his initial burden. First, Captain Robb left no doubt that she and appellant had formed an attorney-client relationship. Moreover, her testimony clearly established that appellant had extensively discussed with her the matters which later developed into court-martial charges. Although the military judge found as a matter of fact "that there was no communication by the accused to Captain Robb about any matter of any substance whatsoever concerning these charges," the record of Captain Robb's testimony does not support this finding as a matter of law. Captain Robb at one point minimized *her* input in these discussions by characterizing it as "more consolation than advice." However, as the military judge early recognized, the critical focus is not on what the lawyer said to the client but rather on what the client said to the lawyer. Second, the evidence unequivocally established that, after this attorney-client relationship had been established and then terminated, Captain Robb joined the staff of the office then prosecuting appellant. Indeed, she was assigned associate

responsibilities with the trial counsel who actually prosecuted appellant.

Thereupon, the burden shifted to the Government to show affirmatively that no communication whatsover took place between Captain Robb and the remainder of the prosecution staff concerning any aspect of appellant's court-martial. During her testimony, Captain Robb was not asked one question by either side concerning her activities once she became a prosecutor. Instead, trial counsel relied entirely on his assertion of fact in his trial brief—and the military judge apparently also did so when entering his findings of fact. If the Government's response to the defense motion to recuse be construed to include an offer of proof, an offer of proof is not itself evidence. Thus, no evidentiary basis existed for the military judge's statement that "in this case no such discussions have taken place between Captain Robb and any of the prosecutors assigned to this office pertaining to this case." Indeed, the judge himself seems to have been aware that the record was deficient in evidence, for he added, "I'm reading between the lines."

■ Immediately thereafter, however, both the civilian defense counsel and the military defense counsel indicated their agreement with the judge's assertion that Captain Robb had not discussed the case with other prosecutors. Although the actions of the defense counsel did not constitute formal entry into a stipulation,[3] we believe that they were in the nature of an informal agreement to stipulate on the part of the defense. We find nothing in the record which would indicate that "doubt exists as to the accused's understanding of what is involved." Para. 54*f*(1), Manual for Courts-Martial, United States, 1969 (Revised edition).

Under these circumstances, we consider it unnecessary to order a hearing in accordance with *United States v. DuBay*, 17 U.S. C.M.A. 147, 37 C.M.R. 411 (1967), wherein Captain Robb could be interrogated as to whether she had discussed appellant's dis-

---

3. *See* para. 54*f*, Manual for Courts-Martial, United States, 1969 (Revised edition), which was in effect at the time of trial; R.C.M. 811, Manual for Courts-Martial, United States, 1984.

closures with some other prosecutor. Instead, we shall proceed now on the premise that no such discussions occurred. On that premise, the Government's burden has been met, so there was no reason to recuse all the other trial counsel in the office to which Captain Robb had been assigned.

Of course, we do not commend the procedure followed in this case. In the first place, trial counsel should have specifically asked Captain Robb whether she had discussed with anyone else any comments made to her by appellant. Secondly, the military judge should have noticed the omission and either suggested that trial counsel ask further questions of the witness or else propounded such questions himself. Thirdly, if the judge chose to "read between the lines"—which itself is not the wisest course of action—he should have asked counsel and the accused to stipulate expressly that his "reading" was accurate. *Cf.* R.C.M. 811, Manual for Courts-Martial, United States, 1984.

The way in which this matter was handled at trial is akin to the loose procedure which led to a recent admonition that trial judges should not let the litigants lapse into a procedure whereby

> the moving party will state the motion and then launch right into argument

4. *See* 18 *The Dicta* 77 (August 10, 1986). This is a publication of the U.S. Air Force Trial Judi-

without presenting any proof but buttressing his/her argument with the assertion that so and so would testify as indicated, if called. The other party then counters with his/her own argument and offers of proof (usually countering with another offer of proof that so and so really will NOT testify as indicated, or someone else would testify that those facts set out in the first offer of proof are not quite accurate).... The successful judge channels this mess into a format where it can be dealt with, and where his/her findings can be upheld on appeal.... Do not let counsel stray into stating what someone would say if they were called. Force them to call the witness, provide valid real and documentary evidence or provide a stipulation. Sticking to proper procedure will save you time and grief and provide a solid record.[4]

IV

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

Judge SULLIVAN did not participate.

ciary for the information of its trial judges.