UNITED STATES, Appellee,

v.

First Lieutenant Timothy J. RUSHATZ,
076–58–5837, United States
Army, Appellant.

ACMR 8800534.

U.S. Army Court of Military Review.

20 Feb. 1990.

For Appellant: Mark L. Waple, Esq. (argued), A. Camden Lewis, Esq., Costa M. Pleicones, Esq., Captain Keith W. Sickendick, JAGC (on brief).

For Appellee: Captain Randy V. Cargill (argued), JAGC, Major Gary L. Hausken, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC (on brief).

Before MYERS, JOHNSON, and NEURAUTER, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Judge:

Appellant was tried by a general court-martial composed of officer members on 11 December 1987, 11 January, 19 February and 7–12 March 1988 at Fort Knox, Ken-

tucky. Contrary to his pleas, appellant was convicted of larceny of $1,500.00 from the United States and conduct unbecoming an officer (three specifications) in violation of Articles 121 and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 933 (1982) [hereinafter UCMJ]. The members sentenced appellant to a dismissal, total forfeitures, and a fine of $10,000. The convening authority approved the sentence but eliminated the fine.

This case arose from appellant's real estate transactions with newly commissioned officers at Fort Knox, Kentucky. Upon their arrival at Fort Knox to attend the Armor Officer Basic Course (AOBC), many student officers were unable to obtain satisfactory on-post housing. In pursuance of his admitted interest in real estate as a means of acquiring wealth, appellant began arranging to provide apartments with short-term leases and furniture to AOBC students. Although providing inexperienced young officers with comfortable quarters was certainly laudable, it is apparent from the record of trial that appellant's motives in offering such services were less than altruistic.

Appellant owned or co-owned certain rental properties near Fort Knox, and leased other dwellings in the area at various times. Appellant solicited occupants to fill these apartments or houses by approaching lieutenants living in local motels or in an area of substandard on-post housing at Fort Knox known as "Splinter Village," and informing them that they could live off-post at no cost to themselves by utilizing the *per diem* reimbursement system. From the commencement of the lease term, these particular tenants agreed to pay appellant a rental amount each month equal to the maximum *per diem* amount for lodging in the Fort Knox area, namely $30.00 per day, or $900.00 per month. Renting under such conditions yielded a substantial profit for appellant since the average price range of unfurnished apartments in the Fort Knox area was apparently between $270.00 and $400.00 per month. Appellant tended to maximize his profit by renting dwellings to groups of lieutenants, but charging them individually the maximum *per diem* rate. For example, appellant rented a house for $460.00 per month, and in turn subleased it to four student officers at the rate of $900.00 per month per person.[1]

Through his real estate business ventures, appellant apparently came in contact with other real estate owners and agents who needed tenants for their rental properties. At no cost to these individuals. appellant agreed to provide tenants for them. In a fashion similar to the way in which appellant found tenants for those properties over which he had ownership or lease authority, appellant would solicit newly arrived lieutenants who were staying in motels or Splinter Village. Appellant would explain the *per diem* system to them, advise them how to obtain a certificate of non-availability of on-post quarters, and how to locate, inspect and rent off-post accomodations. When necessary, appellant would also advise the prospective tenants on acquiring furniture. Appellant would also provide the names of local owners and real estate agents who had apartments available for rent.

The charges in this case arose out of appellant's transactions with Lieutenants Doyle, L'Heureux, Morris, and Panaccione. Each of these officers had been directly or indirectly referred to the Gold City realty company by appellant, and had signed a lease for a certain dollar amount per month for a particular apartment with an agent of that firm. After the lieutenants were established in their rental quarters, appellant maintained contact with them by furnishing advice or various services from time to time during their stay. As appellant also had arrangements with local furniture deal-

---

1. Although the profit generated by such transactions was not *per se* illegal, operation in this manner carried with it the risk that certain tenants might file temporary duty (TDY) claims with the Fort Knox finance office, where personnel, given their familiarity with local lodging conditions, might look askance at housing costing $30.00 a day. In fact, a travel claim filed at the Fort Knox finance office by a reservist was questioned by personnel there, and led to a criminal investigation of the accused in early 1987.

ers, he arranged for furniture rentals and personally made the monthly rental collections. Appellant testified at trial that he encouraged the students to spend as much money as possible with regard to lodging expenses, for such amounts would be reimbursed to them.

As the basic course of each student neared completion and they prepared to leave Fort Knox, appellant arranged meetings with them to "settle" accounts. Typically, as testified to by these officers, appellant asked to see all of their receipts for lodging expenses, such as for utilities and maid service, and inquired as to how they and their respective roommates had split the rental payments to the realty company. Appellant would then prepare a worksheet for each student, which involved computing the amount owed to appellant as "back rent." Appellant multiplied the number of days that the lieutenant had occupied the apartment times the $30.00 *per diem* rate to determine the gross amount that the respective student could claim for TDY expenses. Subtracting out the utility charges and other expenses, and the amount that each had paid for rent in compliance with their original rental agreements, appellant then arrived at a balance due to him which he variously called "back rent" or "deferred rent." Each of the officers testified that they had neither been made aware of the fact that they would owe any amount of rent beyond that stated in their leases with Gold City realty, nor that appellant had told them the actual rent would be $30.00 per day.[2]

Appellant then prepared a receipt reflecting the total amount of these rental expenses, and requested that each of the students sign the receipt and submit it with their claim for TDY expenses at their next duty station. Generally, appellant also prepared and asked the individual lieutenants to sign a new, back-dated rental agreement. The lieutenants were then to remit to appellant the amount designated as "back rent." Finally, to reflect this "indebtedness," appellant would ask the individual to sign a promissory note, the principal amount specified therein being due "after clearing finance and being reimbursed for rent."[3]

For example, Lieutenant L'Heureux and his roommate, Lieutenant Geczo, paid $295.00 per month under a rental agreement which they had signed with Gold City realty on 25 October 1986. L'Heureux and Geczo split the rent and other expenses, such as furniture and utilities. According to Lieutenant L'Heureux, appellant stopped by their apartment on the night of 12 February 1987 "to clear up the account due to the fact that he was—we were going out on a war and he was going TDY ... and he'd be gone when we got back." Appellant then computed the amount L'Heureux supposedly owed him on a "fact sheet." Appellant indicated that the total charge was $3,690.00 ($30.00 per day times 123 days) and that L'Heureux had paid $1,037.00 ($605.00 in actual rent, $300.00 for furniture rental, and $132.00 for utilities), leaving an unpaid balance of $2,653.00. Appellant prepared and gave to L'Heureux a receipt for $3,690.00, dated 25 February 1987, which stated that it was for "Rent of 2 bdrm Fully Furnished, TV, all utilities + cable TV. 2523 Hilltop # 4 Radcliff." Next, appellant had L'Heureux sign another rental agreement indicating a rental of $900.00 per month for a "2 Bdrm Ap—Fully Furnished All utilities + cable + TV + phone" located at the same address. The rental agreement was backdated to 27 October 1986. Appellant instructed L'Heureux to submit the rental agreement and the receipt to the finance office at his next duty station, collect the reim-

2. When asked to explain why the lieutenants testified that they did not understand that the rent would be $30.00 per day, appellant responded, "... the general explanation is that I don't know."

3. The Article 133, UCMJ, charges were based upon the rental receipts prepared by appellant during the final accountings. The Article 121,

UCMJ, charge was based upon five monthly, back-dated receipts prepared by appellant for Lieutenant Doyle. Doyle testified that he had signed a promissory note, submitted his claim and the receipts at his permanent duty station, and had sent appellant a check for $1,535.00 after receiving reimbursement.

bursement, and send appellant the difference between L'Heureux's actual expenses and the amount of the receipt. That amount, $2,653.00, was then reflected in a promissory note appellant had L'Heureux sign.[4]

When questioned about these procedures, appellant would assure those concerned that this transaction was "legal" or that he had obtained a legal opinion from the post staff judge advocate. All the lieutenants initially acquiesced in appellant's scheme, some for reasons they could not articulate well in their testimony, but generally because of appellant's superior rank and his status as a United States Military Academy graduate, as well as the feeling that they owed him something for his advice or services. Further, the lieutenants involved testified to their unfamiliarity with *per diem* and with the TDY claims procedures.

This case was litigated extensively both at trial and before this court. Accordingly, though we find appellant's assignments of error to be without merit, certain of appellant's allegations warrant discussion.

## I

## SUFFICIENCY OF THE EVIDENCE

Appellant asserts that the military judge erred in submitting the case to the panel because the government's evidence failed to prove that he had the specific intent to make false receipts or to commit larceny. The Manual for Courts–Martial provides in pertinent part that the military judge, *sua sponte,* "shall enter a finding of not guilty of one or more of the offenses charged after the evidence on either side is closed and before findings on the general issue of guilt are announced if the evidence is insufficient to sustain a conviction of the offense affected." Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial [hereinafter R.C.M.] 917(a). Such a finding by the military judge is justified only "in the absence of some evidence

which, together with all reasonable inferences and applicable presumptions, could reasonably tend to establish every essential element of an offense charged." R.C.M. 917(d). Further, the evidence is to be evaluated "in the light most favorable to the prosecution," without an assessment of the credibility of the witnesses. *Id.*

We are convinced that the evidence of record not only meets this standard, but is also sufficient to find appellant guilty of the charged offenses beyond a reasonable doubt. UCMJ art. 66, 10 U.S.C. § 866; *United States v. Turner,* 25 M.J. 324 (C.M.A.1987); *United States v. Rath,* 27 M.J. 600 (A.C.M.R.1988), *pet. denied,* 29 M.J. 284 (C.M.A.1989).

## II

## ADEQUACY OF THE ARTICLE 32 INVESTIGATION

Appellant argues that the military judge erred by denying a defense motion for a new Article 32, UCMJ [hereinafter Article 32], investigation. The motion was based on an alleged lack of impartiality by the Investigating Officer (IO), Lieutenant Colonel (LTC) Nuccitelli, on grounds that the IO's *ex parte* investigation materially prejudiced appellant's pretrial rights.

Prior to convening the formal Article 32 hearing in this case, the IO undertook to obtain "background" information by conducting an informal investigation, which included, *inter alia:*

1. Visiting the Fort Knox office of the United States Army Criminal Investigation Command (CID), and speaking with Special Agent (SA) Gamino, who was investigating appellant's case.
2. Visiting the Fort Knox housing referral office.
3. Visiting the Fort Knox finance office.
4. Contacting a government employee who was knowledgeable about on-post solicitation.
5. Visiting an off-post apartment.

---

4. Concerned about the legality of the transaction, Lieutenant L'Heureux did not use the receipt.

6. Contacting a furniture rental company.

7. Speaking on the telephone with a potential witness, a Mrs. Wheeler, who owned a house which appellant had rented and sublet to other officers.

■ During the Article 32 investigation, the IO advised the parties of the extent of his informal inquiries. Defense counsel did not object to the IO's *ex parte* activities during the hearing, but later filed a written objection and request for a new Article 32 investigation after the IO recommended referring the charges to court-martial.[5]

The IO was called as a witness at trial during consideration of appellant's motion for a new Article 32 investigation. With regard to his conversation with SA Gamino, the IO testified that he inquired only as to the status of the investigation of appellant's case, whether the original copies of the statements in the CID report were required for the Article 32 hearing, and whether SA Gamino would be available to testify at the hearing. As for his visit to the post housing office, the IO stated that he went there for information as to the cost of apartments in the area since he had not lived in an apartment in many years. As he leafed through a book containing listings of available apartments, the IO testified that he did not look for places mentioned in the charges but rather examined the listings only to determine the range of prices. The IO also stated that he went to the finance office on post to find out what information with regard to *per diem* entitlements for food and lodging was given to AOBC officers. The briefing outline that the IO received there was furnished to defense counsel, and he stated that he did not discuss the particular facts of appellant's case with any finance office personnel.

With regard to his conversation with the post solicitation officer, the IO testified that his review of the investigation file piqued his curiosity as to how one received permission to solicit individuals on post. Once briefed on this matter, the IO concluded that appellant may have committed an infraction by failing to follow the proper procedures to secure permission to solicit on post. The IO testified that he believed his instructions for conducting the Article 32 investigation of appellant's case required him to notify his commander if he discovered possible violations which had not been charged. Accordingly, the IO sent a memorandum to the convening authority which noted that "during the course of my Article 32 investigation of alleged wrongdoing by [appellant], it became apparent that LT Rushatz *may* have also violated USAARMC Regulations, referred above. . . ." (emphasis added).

The IO also testified that he visited an off-post apartment only to see how a two-bedroom apartment looked, apparently never having lived in one himself. The IO did not interview the occupant of the apartment and viewed the apartment for only a minute. The IO also stated that he had contacted the furniture company only for information with regard to the cost and quality of rental furniture. Finally, with regard to his phone conversation with Mrs. Wheeler, the IO testified that she had called him as the IO to inquire about witness expenses and arrangements involving her attendance at the Article 32 hearing. The IO testified that he referred Mrs. Wheeler to a legal office for information.

With regard to his utilization of the information derived from these inquiries and contacts, the IO testified that he had not formed an opinion as to appellant's guilt or innocence before receiving evidence at the Article 32 hearing. The IO stated that he never discussed the specifics of the case with anyone, and that he had no knowledge of the accused or of the case prior to his

---

5. In addition to questioning the impartiality of the IO because of his *ex parte* activities, the defense memorandum objecting to the Article 32 investigation faulted the IO's lack of knowledge in real estate matters, allegedly causing the IO to "evaluate[ ] the allegations more from the perspective of whether the [AOBC] students were charged 'too much,' than from the perspective of whether they were charged illegally." We find this argument to be without merit. The degree of legal sophistication in real estate matters suggested by appellant does not appear necessary in order to comprehend and address the charges against appellant.

appointment as IO. The IO testified that he did not use the information he had gathered through his *ex parte* inquiries to support his recommendation, and that he had disclosed his personal inquiries to both the defense and the government.

In denying appellant's motion, the military judge made detailed findings to the effect that although the IO had erred by conducting his *ex parte* investigations, the IO's intent was only to acquire general background information, which at most was used to assist in his questioning of the witnesses. The military judge found the IO to be assiduous and diligent, and his conduct of the Article 32 investigation to be completely impartial. Finally, the military judge found that because the IO had not used the information in any way against appellant, there was no prejudice to appellant's case.

■ This court has held that error will result if either of the following occur during the course of an Article 32 investigation:

1. If an individual performing a prosecutorial function furnishes any advice to an investigating officer; or

2. If a non-prosecutor advisor furnishes *ex parte* advice on a substantive matter to the investigating officer.

*United States v. Grimm,* 6 M.J. 890, 893 (A.C.M.R.), *pet. denied,* 7 M.J. 135 (C.M.A. 1979). Such errors give rise to a presumption of prejudice, which can only be rebutted by clear and convincing evidence to the contrary. *United States v. Payne,* 3 M.J. 354, 357 (C.M.A.1977).

■ Unlike the respective situations presented in *Grimm* and *Payne,* the IO in the case *sub judice* neither sought nor received advice from any individual per-

forming a prosecutorial function or from any non-prosecutor advisor on a substantive matter. The presumption of prejudice that flows from such advice is therefore inapplicable to this case. Many of the matters addressed by the IO in his *ex parte* activities are instead administrative in nature, such as discussing witness travel arrangements, or the location and availability of documents necessary to the hearing. Actions in this regard are quite in keeping with the role of the IO. Dep't of Army, Pam. 27–17, Procedural Guide for Article 32(b) Investigating Officer, paras. 2–2e, *f* (15 Mar. 1985) [hereinafter Article 32 Guide]. As to those instances in which the IO actively sought information *ex parte,* "background" or otherwise, we agree with the military judge that the IO acted improperly, and that notification should have been given to both the defense and the government before he undertook such inquiries.[6] Nevertheless, we also find that appellant has failed to demonstrate any prejudice as a result of these improprieties. *See United States v. Mickel,* 26 C.M.R. 104, 107 (C.M.A.1958) (accused must show that defects in Article 32 investigation "adversely affected accused's rights at trial").

■ Assuming *arguendo* that a presumption of prejudice would apply in this case, we find it to be sufficiently rebutted by the IO's testimony. The IO testified that his inquiries were intended merely to provide background information, and that the information derived from them neither caused him to prejudge appellant's guilt nor was it considered in formulating his recommendations with regard to the charges.[7] The information itself was not so significant as to suggest that it would have affected the IO's impartiality merely

---

6. Although the Article 32 Guide does not specifically provide for such investigative activities as visiting an apartment similar to those involved in the charges, or gathering information as to apartment and furniture rental prices, we note that it does give the IO a significant degree of latitude to determine what evidence should be examined at the hearing and allows an IO to visit the scene of an alleged offense after giving notice, if practicable, to all parties. *Id.* at para. 2–2e. A diligent, well-intentioned, but injudicious IO could conceivably construe this as au-

thority to engage in the sort of *ex parte* investigations that LTC Nuccitelli conducted.

7. A reading of the IO's letter to the convening authority as to appellant's possible infraction of post solicitation and standards of conduct regulations and a review of the IO's testimony at trial leads us to conclude that the IO had not formed an opinion regarding appellant's culpability as to the charged offenses or any violations of regulations.

through discovering it. Further, the IO was very forthcoming, advising appellant before or during the formal hearing and providing copies to the defense of any materials he had obtained. Finally, like the military judge, we find the IO's testimony to be very credible. Thus, any presumption of prejudice has been overcome convincingly.

## III

INVASION OF THE ATTORNEY–CLIENT RELATIONSHIP AND DENIAL OF THE MOTION FOR MISTRIAL

Appellant argues that his case was prejudiced through the disclosure of confidential information to the prosecution by a prosecutor with whom he had previously formed a legal assistance attorney-client relationship. Appellant argues that he was further prejudiced at trial when trial counsel inquired as to this information in violation of his attorney-client privilege. Thus, appellant argues, the military judge erred in denying his motion for mistrial and in finding that the specific prosecutors in the case were not disqualified from trying appellant.

### A. FACTUAL BACKGROUND

During the government's case-in-chief, two lieutenants testified that appellant had informed them that his plan had been cleared by military attorneys. On direct, appellant testified that in September 1986, he had gone to a legal assistance office on post and had spoken with a Captain (CPT) Lind regarding his real estate scheme. Appellant stated that CPT Lind refused to discuss the business aspects of his plan, but did give an example of a location where military officers would rent their vacant homes to fellow officers on TDY at the maximum *per diem* rate.

On cross-examination, the following colloquy occurred between trial counsel, appellant and defense counsel regarding an apparent discrepancy in appellant's testimony as to when the executive officer of appellant's unit had allowed him to initiate his real estate scheme, and when that offi-

cer had recommended that appellant seek the advice of a judge advocate:

TC: He couldn't have made an appointment or let you go September 9th when he was done as your XO in August of '86—

ACC: That's—that's correct.

TC:—could he?

ACC: That's correct.

TC: So he must—

ACC: But—

TC: Excuse me, Lieutenant Rushatz.

IDC: Allow the witn—the accused to explain the evid—the answer.

TC: Please explain, explain.

ACC: I went to JAG twice, May and September, both times discussing this. Their records have no recall of it though.

TC: They don't?

ACC: Well, they do from what we have discussed with them, but it's not as clear as I communicated to him at that time.

TC: But he couldn't have sent you to JAG in September as your XO because he sent you in May; isn't that correct?

ACC: He never sent me, I requested time off to go visit the JAG.

TC: Then you came back and told him everything was okay; isn't that correct?

ACC: That's correct.

TC: And that was the 6th of May, wasn't it?

ACC: That's right.

TC: Did you talk to a CPT Mullis on the 6th of May?

ACC: Yes, I did.

TC: And he never talked to you about that, did he?

ACC: That's what he claims, yes.

TC: That's what he claims?

ACC: That's right.

TC: He—

ACC: He can't remember.

Trial counsel then questioned appellant as to what he had discussed with CPT Mullis in December 1987, and the defense objected on grounds that the information sought by trial counsel was privileged information. In the subsequent Article 39(a), UCMJ, session held on the issue, defense counsel moved for a mistrial when it was revealed

that CPT Mullis had mentioned the existence of his attorney-client relationship to members of the prosecution.

On the motion for mistrial, CPT Mullis testified that their May 1986 conversation did not involve appellant's real estate dealings in any way. CPT Mullis did not state what was discussed during that meeting, and it is not otherwise disclosed in the record. CPT Mullis also testified that in August 1987 he was reassigned as a prosecutor. When appellant's Article 32 hearing commenced on 13 November 1987, CPT Mullis was present in the capacity of an assistant trial counsel. It was apparently at this time that CPT Mullis first became aware of the charges against appellant, and advised another prosecutor not then involved in the case, CPT Smith, of his previous legal assistance relationship with appellant. Despite CPT Mullis' disclosure that the relationship did not involve any of the matters under investigation, CPT Smith urged CPT Mullis to remove himself from further involvement with appellant's case, which CPT Mullis then did. CPT Smith took CPT Mullis' place as assistant trial counsel and was eventually detailed to appellant's court-martial in that capacity. The charges against appellant were referred to trial on 23 November 1987, and in late December 1987, appellant went to CPT Mullis' office intending to discuss their earlier legal assistance meeting. CPT Mullis advised appellant that what they had previously discussed remained privileged information, but that as a prosecutor he could no longer enter into an attorney-client relationship as to any other matter appellant wished to discuss. As appellant was leaving CPT Mullis' office, CPT Smith entered the office and inquired of CPT Mullis the nature of his conversation with appellant. CPT Mullis replied that appellant had inquired about their previous legal assistance conversation, and again stated that the May 1986 conversation did not concern the charges against appellant. CPT Mullis testified that he never divulged any information regarding appellant to the prosecutors beyond the fact that he and appellant had discussed an unrelated matter in their May 1986 conversation.

In denying appellant's motion for mistrial on these grounds, the military judge found that no privileged matters had been divulged by CPT Mullis to the prosecution. The military judge, however, found that the prosecution had improperly utilized the negative implication of CPT Mullis' denial of discussion of certain matters with appellant; namely, that appellant had not discussed his real estate ventures with a judge advocate as he had alleged. In view of the nature of this impropriety, and his regard for the attentiveness of the panel, the military judge believed that the error could be cured by appropriate instruction. Thus, he instructed the members as follows:

> Members of the court, when we broke earlier this morning, trial counsel had just asked the accused some questions relating to some—some consultations that the accused may have had with Captain Mullis. You are advised that trial counsel had no authority, no right, and it was highly improper for him to question the accused about any relationship he had with CPT Mullis. That's a—the accused has an absolute privilege to not discuss that and that's the attorney client privilege and its not even invoking his rights, it's not a question of that, it's that the trial counsel—that's a hands-off subject. Any time that trial counsel gets near it he's acting in a highly improper manner and you are instructed that you must disregard entirely everything that—anything was discussed, anything that was mentioned of any relationship between the accused and Captain Mullis. Is there any member of the court who cannot follow that instruction? Apparently not.

## B. PRIVILEGED INFORMATION

[9] Generally,

(1) [w]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the

legal advisor, (8) except the protection be waived.

8 Wigmore, Evidence § 2292, 554 (McNaughton rev.1961) [hereinafter Wigmore]; *see* Manual for Courts–Martial, United States, 1984, Mil.R.Evid. [hereinafter Mil.R.Evid.] 502; Dep't of Army, Pam. 27–26, Rules of Professional Conduct for Lawyers, Rule 1.6, *Confidentiality of Information* (31 Dec. 1987) [hereinafter DA Pam. 27–26]. Ordinarily, a general statement by an attorney that his relationship with a client does not involve a particular matter divulges no protected information. Indeed, jurisprudence in this area is overwhelmingly predicated upon disclosure of the actual information communicated by the client to the attorney. *See* Wigmore, §§ 2290–2341, at 542–675; 81 Am.Jur.2d *Witnesses* §§ 172–230, at 208–230 (1976). Certain information, such as the existence of the attorney-client relationship, *Chirac v. Reinecker*, 24 U.S. (11 Wheat.) 280, 295, 6 L.Ed. 474 (1826), and fee arrangements, *In Re Grand Jury Subpoenas Duces Tecum*, 695 F.2d 363, 365 (9th Cir.1982), are almost always considered to be outside the protection of attorney-client confidentiality and the attorney-client privilege. In the rare case when "a strong possibility exists that disclosure of the information would implicate the client in the very matter for which legal advice was sought in the first place," however, such information may be protected. *Id.; In Re Sealed Case*, 877 F.2d 976, 979 (D.C.Cir.1989).

██ CPT Mullis could not reasonably have anticipated that whether appellant had discussed his real estate ventures with a military attorney would become an issue at appellant's trial at the time he made his disclosures. In resolving his dilemma as to whether he should represent the government in appellant's prosecution, however, the more prudent course of action would have been to present CPT Smith with a hypothetical situation in asking CPT Smith's advice, and then to simply advise the prosecutors only that he had had a previous attorney-client relationship with

appellant and to recuse himself on that basis. Nevertheless, we find that CPT Mullis' intent in making the disclosures was prompted by his concern for ethical considerations,[8] and that the information revealed by CPT Mullis was neither the sort of information traditionally considered confidential or privileged, nor does it meet the requirements for an exception to the general rule. *See In Re Grand Jury Subpoenas Duces Tecum*, 695 F.2d at 365.

## C. FAIRNESS DOCTRINE

[11] Even assuming *arguendo* that CPT Mullis did violate his duty to appellant by disclosing that his conversation with appellant in May 1986 did not concern the subject matter of the charges against appellant, it is clear that appellant was not prejudiced by this error. Not only was the information rather insignificant in the overall context of the case, we believe that the "doctrine of fairness" would have allowed its disclosure under the circumstances of this case.

As recently enunciated by the Second Circuit Court of Appeals, the "fairness doctrine" seeks

to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information. Under the doctrine the client alone controls the privilege and may or may not choose to divulge his own secrets. But it has been established law for a hundred years that when the client waives the privilege by testifying about what transpired between her and her attorney, she cannot thereafter insist that the mouth of the attorney be shut. From that has grown the rule that testimony as to part of a privileged communication, in fairness, requires production of the remainder.

*In Re Bulow*, 828 F.2d 94, 101–102 (2d Cir.1987) (citations omitted); *cf. Woburn v. Henshaw*, 101 Mass. 193, 200 (1869) ("If

---

**8.** *See* DA Pam. 27–26, Rule 1.9, *Conflict of Interest: Former Client*, and Rule 1.10, *Imputed Dis-* *qualification: General Rule.*

the client sees fit to be a witness, he makes himself liable to full cross examination like any other witness").

We find appellant's testimony as to his conversations with CPT Mullis and CPT Lind in May and September 1986, respectively, waived his attorney-client privilege as to those conversations. Appellant testified on direct as to his conversation with CPT Lind, who later testified as a government witness in rebuttal as to their conversation without defense objection.[9] In attempting to resolve a tangential inconsistency in his direct testimony, appellant stated on cross-examination that he had spoken with a military attorney in May 1986 about his real estate plans as well. Though mindful of authorities which question the propriety of waiver through testimony on cross-examination, *see* McCormick, Evidence, § 93 at 224 (E. Cleary, 3d ed. 1984), we find the "fairness doctrine" would have been applicable under the circumstances of this case. *See Hoyas v. State*, 456 So.2d 1225, 1229 (Fla.App. 3 Dist.1984).

 Despite this finding, we approve of the military judge's curative actions with regard to this information, which eliminated any possibility of prejudice to appellant. *See Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978) (instructions curative, not reinforcing).

### D. MOTION FOR MISTRIAL

The Court of Military Appeals has noted its "longstanding concern with the military attorney-client relationship in the military justice system." *United States v. Payton*, 23 M.J. 379, 380 (C.M.A.1987). Accordingly,

> once the accused shows that he entered into an attorney-client relationship with a particular lawyer concerning *the same or related matters* to those being tried at his court-martial and that this lawyer, after terminating the relationship, has joined the prosecutor's office then prosecuting the accused, the Government has the burden of affirmatively demonstrat-

ing that no communication whatsoever has occurred between that lawyer and the prosecution staff regarding *any aspect* of the accused's case.

*United States v. Stubbs*, 23 M.J. 188, 193–94 (C.M.A.), *recon. denied*, 24 M.J. 222 (C.M.A.), *cert. denied*, 484 U.S. 846, 108 S.Ct. 142, 98 L.Ed.2d 98 (1987) (emphasis added).

 We find that appellant has failed to meet the threshold requirement set out in *Stubbs* to raise this issue. CPT Mullis positively and credibly denied discussing appellant's real estate venture with him at trial. CPT Mullis' testimony is completely consistent with CPT Smith's averments on the record that CPT Mullis had stated that he had not discussed such matters with appellant. Further, there was testimony at trial that Army legal assistance policy prohibits the furnishing of advice to individual clients on business or commercial matters, a policy with which both CPT Mullis and CPT Smith appear to have been quite familiar.

Assuming *arguendo* that appellant did make an appropriate showing under *Stubbs*, we find that the government met its burden of affirmatively demonstrating that no prohibited communication had occurred. CPT Mullis informed the prosecution only that his legal assistance relationship with appellant did not concern the matters for which appellant was being investigated and tried. Despite the Court of Military Appeals' broad statement that communication regarding "any aspect" of the accused's case is prohibited, we hesitate to find that this includes non-protected information of the sort at issue here. *But see Stubbs*, 23 M.J. at 194.

Further, we conclude that it was not the intent of the government to interfere with the appellant's attorney-client relationship and there was no intentional misconduct by the prosecution in this regard. Nevertheless, with regard to trial counsel's questions of appellant as to his December 1986

---

**9.** CPT Lind testified that he declined to advise appellant on any ventures of a commercial nature, other than routinely renting his home or

apartment during his absence from the Fort Knox area.

meeting with CPT Mullis, we note that trial counsel intruded into a sensitive area not specifically raised during appellant's case-in-chief, nor initially addressed by appellant during cross-examination. The risk of prejudice to the accused through such inquiry, however, was avoided by the timely objection of defense counsel and the subsequent curative instruction of the military judge to the members to disregard all testimony as to appellant's dealings with CPT Mullis.

Appellant has failed to demonstrate a defect in the course of his trial of the magnitude that should be remedied by finding a mistrial. Under the circumstances of this case, the trial counsel were not disqualified from serving as prosecutors because of conversations with CPT Mullis about the case, and the military judge therefore did not abuse his discretion by denying the motion for mistrial. *United States v. Jeanbaptiste*, 5 M.J. 374, 376 (C.M.A.1978).

## IV

### PROSECUTORIAL MISCONDUCT

Appellant alleges that trial counsel engaged in prosecutorial misconduct by making disparaging and disruptive facial gestures during the direct examination of defense witnesses. The record of trial in this lengthy and intensively litigated case discloses only two occasions when the military judge admonished trial counsel for inappropriate behavior. The first time occurred during civilian defense counsel's examination of a defense witness with regard to certain of appellant's real estate dealings, as shown by the following colloquy:

CDC: Okay. What was the—what form did the discussion take with these lieutenants?

I would, if Your Honor, please ask that Captain S[ ] not go through visual—

TC: I just—

CDC: —during the course of my examination and laughing.

MJ: Well, I didn't see it if he did anything, but if he did, he won't do it again.

During trial counsel's cross-examination of appellant as to appellant's rental agreement with a former roommate, this exchange occurred:

TC: Okay. Would it be a surprise then to learn if he understood all this, that Lieutenant Smawley told me he was staying there for free at your place?

WIT: I don't know, sir.

TC: There doesn't seem to be much understanding, does there, Lieutenant Rushatz?

WIT: Yes, there does.

MJ: Captain S[ ].

TC: Yes, sir.

MJ: That's the last time you're going to smirk in this trial.

TC: My mouth is dry, sir.

MJ: I don't care what your problem is, wear a mask, but you are not going to smirk.

Although the record contains no other indication of improper conduct by trial counsel, appellant has submitted to this court two affidavits by individuals who attended the trial and who aver that trial counsel made other gestures, including "looks of disgust and/or disbelief" that the military judge could not see, but which were visible to the panel members.

The Air Force Court of Military Review has defined prosecutorial misconduct as "an attempt to persuade the factfinder by deceptive or reprehensive methods." *United States v. Littlehales*, 19 M.J. 512, 516 (A.F.C.M.R.1984), *aff'd*, 22 M.J. 17 (C.M.A.), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2901, 90 L.Ed.2d 987 (1986). An element of bad intent on the part of the prosecutor is implicit in the *Littlehales* standard; thus, a prosecutorial error will not constitute misconduct in the absence of such intent on the part of the prosecutor that appellate courts can discern from the record of trial. *United States v. Goodyear*, 14 M.J. 567, 570 (N.M.C.M.R.1982); *see United States v. Grandy*, 11 M.J. 270, 275 (C.M.A.1981) (no prejudice resulted where record showed no intentional misstatement of evidence by trial counsel, *inter alia*). The difference is significant. While prosecutorial misconduct goes to the heart of the integrity and fairness of the judicial system, and must therefore always

be tested for prejudice, the failure to object to improper actions by the prosecution which do not meet the misconduct threshold will waive the issue on appeal. R.C.M. 919(c) and 1001(g).

▬ In light of defense counsel's timely objection to perceived improper behavior on the part of the trial counsel in the first described instance, and the military judge's quick resolution of the second, we find waiver inapplicable to this issue. However, in light of defense counsel's failure to object to other alleged instances of improper conduct at trial, and the fact that defense counsel did not address this alleged course of conduct in their lengthy post-trial submission to the convening authority, we find the affidavits submitted by trial spectators unconvincing.[10] Further, in view of the observant and alert manner displayed by the military judge during the entire course of the trial, and the prompt and forceful way in which he dealt with perceived improprieties, we attribute little weight to these statements.

Accordingly, we need only examine the two instances of improper behavior on the part of the trial counsel appearing in the record to determine whether prosecutorial misconduct occurred. Considered in context, these two instances simply do not rise to the level of an intentional and underhanded effort to convince the members of appellant's guilt or to discredit witnesses. *Littlehales*, 19 M.J. at 516. Further, we find no prejudice to the accused on the basis of trial counsel's behavior. Indeed, given the serious atmosphere of a court-martial, we believe that unnecessary emotionalism or improper demeanor on the part of government counsel would be viewed by the members as unbecoming and unprofessional, rather than working to the disadvantage of the accused.

10. The submission packet to the convening authority included a letter from one of the affiants, appellant's father, containing the same information which he avers before this court.

11. The fourth element of this instruction related to that part of the specifications of the Article 133, UCMJ, offenses which read as follows:

## V

### INSTRUCTIONS ON FRAUDULENT RECEIPTS

Appellant asserts that when the military judge instructed the members that they could find appellant guilty by exception to one element of the Article 133, UCMJ, offenses, he presented two alternate theories upon which the panel could find appellant guilty, one of which was incorrect as a matter of law. We disagree.

On findings, the military judge instructed the members that they had to find the following eight elements of the Article 133, UCMJ, offenses to have been proven beyond a reasonable doubt: (1) that appellant wrongfully made a rental receipt; (2) that he gave the receipt to a named lieutenant; (3) that the receipt indicated payment of a certain amount of money for apartment rental; (4) that the receipt was false in that the amount stated thereon had not been paid to appellant for rent and the amount was not the true rental fee for the apartment;[11] (5) that the appellant knew the receipt was false when he made it; (6) that the appellant made the false receipts for the purpose of obtaining approval of a claim against the United States; (7) that appellant wrongfully advised the named lieutenant to submit the false claim; and (8) that under the circumstances appellant's conduct was unbecoming an officer and a gentleman.

▬ With regard to the fourth element, the military judge also instructed the members that they could find appellant guilty by exception if they determined that the amount indicated on the rental receipt prepared by appellant was not the true rental amount, even if they did not find beyond a reasonable doubt that the amount specified on the receipt had been paid to appellant. We find the military judge did

"... which statement was false and fraudulent and which [appellant] knew was false and fraudulent in that [the pertinent AOBC officer] had not paid [the amount specified in the receipt] to [appellant] for rent of said apartment and in that [such amount] was not the true rental amount for the apartment...."

not err by instructing the members that they could find the appellant guilty by exceptions to the Article 133, UCMJ, specifications. Where a specification posits two conditions, either of which may satisfy an element of that specification, a military judge may tailor his instructions to permit exception of one. *See* R.C.M. 920(a); Dep't. of Army, Pam. 27–9, Military Judges' Benchbook, para. 7–15 (1 May 1982). In any event, appellant was not found guilty by exception. The findings worksheet indicates that the members were convinced beyond a reasonable doubt that both conditions of the fourth element were proven. This assignment of error is therefore also without merit.

## VI

### UNCHARGED MISCONDUCT

Appellant also argues that the military judge erred by admitting irrelevant and highly prejudicial evidence of "other crimes, wrongs or acts" in violation of Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 404(b).

██ The Court of Military Appeals has set out a three-step analysis to determine whether evidence of extrinsic acts is properly admissible under Mil.R.Evid. 404(b). The standards are as follows:

1. Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs or acts? *United States v. Mirandes–Gonzalez*, 26 M.J. 411 (C.M.A. 1988).

2. What is the purpose for which the evidence is offered? That is, to be relevant and admissible, it must relate directly to some specific "fact that is of consequence" to the action which is made more or less probable by the existence of this evidence, other than to show that the accused is predisposed to commit crime. Mil.R.Evid. 401; *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A.1989).

3. Is the "probative value ... substantially outweighed by the danger of unfair prejudice"? Mil.R.Evid. 403; S. Saltzburg, L. Schinasi, D. Schleuter, *Military Rules of Evidence Manual* 362 (2d ed. 1986 & 1988 Supp.).

*See United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A.1989). If the evidence fails to meet any of these standards, it is inadmissible. *Id.* *See also United States v. White*, 23 M.J. 84 (C.M.A.1986); *United States v. Brannan*, 18 M.J. 181 (C.M.A. 1984).

Regarding the first standard, the Court of Military Appeals has noted that the threshold is now very low as to the admissibility of other misconduct. *United States v. Castillo*, 29 M.J. 145, 151 (C.M.A.1989). The military judge must now admit the evidence "if he concludes that the factfinder could reasonably find by a preponderance of the evidence that the misconduct had occurred, even though the judge himself would not make such a finding." *Id.* With regard to the relationship between the charged and extrinsic offenses, whether evidence of an extrinsic offense is admissible under Mil.R.Evid. 404(b) is a "function of the similarity of the extrinsic offense to the offense charged." *United States v. Peterson*, 20 M.J. 806, 811 (N.M.C.M.R. 1985). The degree of required similarity "is not constant but varies according to the purpose for which the evidence is offered." *Id.* For example, "the similarity requirement is less stringent for proving intent than it is for proving ... common plan or scheme." *Id.* *See also Brannan*, 18 M.J. at 185.

To be relevant for purposes of showing a common plan or scheme, the evidence must show "common features indicating common design" as between the charged and extrinsic offenses. *Peterson*, 20 M.J. at 811. The common features must be sufficient to show an identity so as to suggest that all of the acts were the result of the same plan. *Id.* at 810. However, when extrinsic offenses are introduced to show intent, "the degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent." *Id.* at 812; *United States v. Merriweather*, 22 M.J. 657, 663 n. 4 (A.C.M.R.1986). Moreover, it is not determinative of admissibility of the extrinsic offense that the

charged offense "is labeled as a 'general intent' or as a 'specific intent' crime." *Peterson*, 20 M.J. at 813.

During its case-in-chief, the government called as witnesses four lieutenants who had been members of an August 1986 AOBC, which was just prior to the arrival of the students involved in those transactions with appellant from which the charges arose. These four officers had also been assisted by appellant in finding suitable living accommodations during their attendance at the basic course. Three of these officers testified that they had signed leases with the landlord of their apartments, a Mr. Roush, for a certain amount of money far below the maximum *per diem* rate for the area. They also testified that appellant had "settled up" with them at the end of their lease terms, and that he had calculated a certain amount of "back rent" due to him. These officers then either signed a promissory note for, or paid appellant, this amount.[12]

▆ We note first that appellant objected only to the testimony of 2LT Bluestone, on grounds that it was not proper evidence under Mil.R.Evid. 404(b) because it tended merely to reflect unfavorably on appellant's character rather than show a common purpose or design. Accordingly, we find that under the circumstances of this case, any issue as to the admissibility of the other lieutenants' testimony was waived. R.C.M. 801(g); Mil.R.Evid. 103.

▆ Even assuming *arguendo* that waiver is inapplicable, we find the evidence at issue to be squarely within the ambit of Mil.R.Evid. 404(b). The testimony of these four witnesses at trial was consistent and credible, and therefore proved that appellant had engaged in real estate transactions similar to those which formed the basis of the charges against him. The acts occurred at the same place and in the same fashion as those appellant was charged

with, and were very close in time to those acts as well. A sufficient nexus therefore existed between the extrinsic acts and the charged offenses to make the lieutenants' testimony relevant to either appellant's intent or the existence of a common plan or scheme. In this regard, the evidence was much more probative to the issues at trial then it was unfairly prejudicial to appellant.

Accordingly, this assignment of error too is without merit.

## VII

### DENIAL OF REQUEST FOR DEFENSE WITNESSES

▆ Finally, appellant asserts that the military judge erred in denying appellant's request that certain individuals be produced at trial as witnesses for the defense. We find the military judge properly denied appellant's request, for such witnesses would have at best been merely cumulative. *See United States v. Tangpuz*, 5 M.J. 426, 430 (C.M.A.1978); *United States v. Williams*, 3 M.J. 239, 240 (C.M.A.1977).

The findings of guilty are affirmed. Pursuant to *United States v. Warner*, 25 M.J. 64 (C.M.A.1987), only so much of the sentence as provides for a dismissal and forfeiture of two-thirds pay per month until the dismissal is executed is affirmed.

Senior Judge MYERS and Judge NEURAUTER concur.

---

12. Second Lieutenant (2LT) Bluestone lived in one of Mr. Roush's apartments for only about three weeks, and consequently never engaged in any sort of "accounting" with appellant as to back rent. 2LT Bluestone testified that appellant had not informed them that the rent of their apartments was actually $30.00 per day.

2LT Bluestone also testified that appellant had stated that certain furniture vendors would issue rental receipts for items if requested, allowing the items to be claimed as an allowable expense on a TDY claim even though the items had actually been purchased.